MOORE v. PALMER.

FLOWERS v. SAME.

AUTOMOBILES—TRACTOR DETACHED FROM SEMITRAILER—CONSENT OF
OWNER—INSTRUCTIONS.

Whether or not lessee of tractor, used in hauling freight in semitrailers and deemed owner under the motor carrier acts, had consented that driver-lessor-employee might use the same while detached from the semitrailer for purpose of going to his home *held*, question for jury in action arising from negligent operation of the tractor while so detached and being used by the driver-lessor-employee while en route from place where he had detached the semitrailer to his home; pertinent instructions being proper although omitting submission to jury as to whether the driver was within the scope of the employment at time the accident occurred, per SMITH, EDWARDS, VOELKER, and BLACK, JJ., and because defendant "owners" were properly protected by instructions as to whether or not the driver was operating the tractor within the consent extended, per DETHMERS, C.J., and KELLY, J.; there being no question as to the negligence of the driver, as to contributory negligence of the plaintiffs' driver, nor as to the amount of verdicts (CLS 1954, §§ 257.37, 257.401).

SHARPE and CARR, JJ., dissenting.

Appeal from Genesee; Elliott (Philip), J. Submitted April 9, 1957. (Docket Nos. 53–56, Calendar Nos. 46,985–46,988.) Decided November 26, 1957.

Case by Clifford Moore against Wesley G. Palmer and against Philip G. Wiederhold and Edward E.

REFERENCES FOR POINTS IN HEADNOTES

5A Am Jur, Automobiles and Highway Traffic § 639.
Deviation from employment in use of employer's car during regular hours of work. 51 ALR2d 8.
Employer's liability for employee's negligence in operating employer's car in going to or from work or meals. 52 ALR2d 350.

Wiederhold, doing business as Wiederhold Freight Lines, for damages arising from collision of motor vehicles. Similar actions by Gladys Moore, Hattie Flowers, and Jean Moore by her next friend. Cases consolidated for trial and appeal. Verdicts and judgments for plaintiffs. Defendants Wiederhold appeal. Affirmed.

*John W. Babcock,* for plaintiffs.

*Edward N. Barnard,* for defendants.

SHARPE, J. (*dissenting*). This is an appeal in 4 consolidated injury cases, arising from a collision between an automobile owned and driven by Clifford Moore and a tractor driven by Wesley G. Palmer, in which Moore and 3 passengers in his automobile were injured. The cases were tried together and a verdict returned by the jury in each case. No issue is raised as to the amount of the verdicts, also, no issue is raised as to the contributory negligence of Clifford Moore, the driver of the automobile, and no issue is raised as to Wesley G. Palmer, the driver of the tractor not being guilty of negligence.

Plaintiff Clifford Moore was an employee of the city of Detroit. He was returning from a trip to Idlewild, Michigan, on Sunday, May 31, 1953, with his wife Gladys, his daughter Jean and his wife's aunt, Hattie Flowers. He was going to Ypsilanti to leave Jean who attended college there. Attached to the back of his automobile was a small 2-wheel trailer. As he entered Flint he turned right off US-10 on Court street and traveled thereon until he reached the intersection of Court and Ann Arbor streets, where he made a left turn, traveling in a southerly direction. Later he turned right on Fenton road, also known as US-23. While making the turn on Fenton road he collided with a tractor drawn by de-

fendant, Wesley G. Palmer. The collision occurred at about 7 p.m. It was raining at the time of the collision. The left front of Moore's car was damaged. The car was about a foot or 18 inches from the curb when it was struck. Defendant Palmer was later convicted of felonious driving because of the collision. Defendant Palmer had purchased the tractor for the purpose of hauling loads of merchandise for Wiederhold Freight Lines. He had entered into a lease agreement with Wiederhold on April 8, 1953, leasing the tractor to the partnership. The lease provided, in substance, and, in part, as follows:

1. Palmer's compensation for the use of the tractor by Wiederhold was to be "70% less insurance;"

2. If Palmer were engaged as driver of the tractor, he would be deemed an employee of Wiederhold with all of the rights and privileges of an employee and with the Wiederholds assuming all of the duties and liabilities of an employer;

3. Wiederhold was to control the "use of operation" of the tractor, "have complete control of such equipment," and assume "all legal liabilities which may arise as though in fact said equipment was owned by" Wiederhold; and

4. The lease agreement was to be "construed in all things in accordance with the laws and decisions of" the State of Michigan.

Late in May, 1953, Wiederhold Freight Lines instructed Palmer to drive the tractor and a Wiederhold trailer to Toledo, Ohio; pick up a load of fertilizer and deliver it to North Branch, Michigan. Palmer arrived in Toledo during the evening of May 29, 1953, which was Friday of that week. His trailer was loaded during that evening and he drove the tractor and trailer back into Michigan and stopped at a place near the State line between Ohio and Michigan where Palmer and his passenger Floyd Tackebury remained until the morning of Sunday, May 31,

1953. During the day of May 31st, Palmer drove the tractor and trailer to a point near the junction of US–10 and the Dort highway south of Flint located in an unincorporated area commonly known as Whigville and there detached the trailer from the tractor. Palmer's plan was to leave the trailer parked at Whigville, use the tractor to drive through and north of Flint to his home in Birch Run, to remain at his home over Sunday night and to return to Whigville with the tractor Monday morning, pick up the trailer and complete the transportation of the fertilizer to North Branch on Monday.

Wesley Palmer and Floyd Tackebury testified that after starting in the tractor to drive to Palmer's home in Birch Run, they traveled north from Whigville on US–10, west on the Bristol road to US–23 and then north on US–23 where, a short distance from Bristol road, they stopped at a tavern known as Glocca Morra and each had a couple of bottles of beer. Both of them further testified that while in the Glocca Morra cafe they met a brother of Wesley Palmer, Mr. Russell Palmer, and that upon resuming their journey towards Wesley Palmer's home they took Russell Palmer with them to drop him off at a point on US–10 north of Flint where he (Russell) had his car parked. Wesley Palmer then drove the tractor north on US–23 to the point of the accident.

Russell Palmer testified that on Sunday, May 31, 1953, he first met his brother Wesley and Floyd Tackebury at a tavern and lunch room on Hemphill road, from where the three of them drove in the tractor west on Hemphill road to the Fenton road, then south on Fenton road to the Glocca Morra tavern, then north on the Fenton road to the point of the accident.

Because the relationship between Palmer and the partnership is of paramount importance we recite the following. Palmer paid and was responsible for

the expense of operating the tractor, for the fee required to obtain a plate from the Michigan public service commission, and decided what route he should follow in hauling a load of freight. Palmer testified:

"I assumed I could use it, I was told I could use it to go to and from work. Well I assumed that was home, to and from work. In other words I was told that I could use this tractor to go to my home from my work and back. And I was told that."

Edward Wiederhold of the partnership testified:

"*A.* It was late at night that he called me and said he was at home on the run from Toledo, Ohio. I think it was between 1 and 2 o'clock in the morning. It would be Saturday morning, yes. Between 1 and 2 a.m. in the morning. That would have been May 30th, Decoration Day—

"*Q.* And can you remember, will you give us the best as you can the conversation that took place between you and Mr. Palmer in that telephone conversation?

"*A.* Well, he only said he was in, asked if I thought the elevator would be open so he could unload.

"*Q.* What else did he tell you, did he tell you where he was,—what do you mean by 'in'?

"*A.* In, home, he was calling us collect, he used his own phone.

"*Q.* He used the words, he was in.

"*A.* That he was home from Toledo, yes, he wanted to know if he could unload in the morning. Sometimes the elevators are open in the morning, he asked if they were open so he could make delivery.

"*Q.* He said he was home in Birch Run, is that it?

"*A.* Yes.

"*Q.* Home where?

"*A.* Well, I took it for Birch Run, yes.

"*Q.* He is from Birch Run,—he said, also, whether or not he could complete the delivery the next day,— where was the delivery to be made?

"*A.* North Branch, Michigan.

"*Q.* What was your answer to him?

"*A.* Well, I didn't think he could make delivery Saturday because I didn't think they would be open.

"*Q.* What else did you tell him, if anything?

"*A.* Well, I don't think there was very much else I told him but that he would have to deliver it Monday."

When the cause came on for trial, and at the close of plaintiff's proofs, counsel for Wiederhold Freight Lines made a motion for a directed verdict on the theory that Palmer was not acting within the scope of his employment at the time of the accident. The trial court took this motion under advisement under the Empson act* and submitted the cause to the jury. The trial court gave the following instructions to the jury:

"Before you could find the Wiederholds liable you would first have to find that the plaintiff has proved by a preponderance of the evidence that Wesley Palmer was negligent and that Wesley Palmer's negligence was the proximate cause of this accident and the injuries and that the plaintiffs themselves were free from contributory negligence, but, you would have to find more, and that is what I am going to talk about now. There is a statute of the State of Michigan; it is found in   *   *   *   [CLS 1954, § 257.-401 (Stat Ann 1952 Rev § 9.2101)] and it reads, in part, as follows: 'The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of such [motor] vehicle whether such negligence consists of a violation of the provisions of the statutes of the State or in the failure to observe such ordinary care in such operation as the rules of the common law requires.' And 'The owner shall not be liable'—I call your special attention to this paragraph—'the owner shall not be liable, however, unless such motor vehicle is being driven with his or

* CL 1948, § 691.691 (Stat Ann 1955 Cum Supp § 27.1461).—Reporter.

her express or implied consent or knowledge'—unless such motor vehicle is being driven with his or her express or implied consent or knowledge.  *  *  *

"Now in addition to the elements which I have already stated as to the necessity of proving the liability of Wesley Palmer, before you can find the Wiederholds liable in this case you must find that at the time of this accident Wesley Palmer was driving this vehicle with the express or implied consent or knowledge of the Wiederholds, and the burden is upon the plaintiffs to prove that fact as the other elements in the case.  *  *  *

"Now if you find—even if you find that Palmer was negligent and that his negligence was the proximate cause of this accident and injury, and the plaintiffs themselves were free from contributory negligence— if you should also find that Wiederhold did not give to Palmer consent to drive that tractor while disconnected, then in such case the Wiederholds would not be liable, but if, on the other hand, you do find the elements necessary to find Palmer liable and you further find that Palmer was given consent by the Wiederholds to drive that tractor while disconnected, as Mr. Palmer testified, then the Wiederholds would only be liable if at the time of the accident Palmer was driving within the terms that Wiederhold has consent to.  The consent, according to Palmer's testimony was to use the tractor to and from home and work.  If you find such consent it would be for you to determine whether at the time of the accident he was driving the tractor for that purpose and reasonably in pursuance of that consent.  He would not be driving with Wiederhold's knowledge or consent if at the time he was not driving reasonably within the meaning of the consent which had been granted him.  If he should depart for his own purposes from the consent use he would not be liable while so departing from the consented use.  If he goes outside the consent or permission, that is, permission to use the tractor to and from his home and work, if he goes outside of that consent and if at

the time of the accident he was outside of that consent, the Wiederholds would not be liable. You may take into consideration all the circumstances which you find to be true in considering whether or not at that time—if you find there was consent to use the tractor to and from work—whether or not at that time, at the time of the accident he was so using the tractor. You make take into consideration all the evidence including the kind of equipment, the lease, and all the other evidence which you find bears upon that question, in determining that question. If he was not driving reasonably within the granted consent, as for instance if he had gone on a personal or independent joy ride of his own or if he was not on his way home from work, he wouldn't be within the consent."

The jury returned a verdict for each of the plaintiffs. Defendants appeal and urge that their motion for a directed verdict should have been granted, because Palmer, the driver of the tractor, was not acting within the scope of his employment or authority when the accident occurred.

It is the theory of plaintiffs that by conversations between Wiederhold and Palmer, as well as by course of conduct, the written contract was either altered or enlarged. We note that the lease agreement does not authorize Palmer to use the tractor and trailer in the manner that it was used upon the occasion in question. If such use was permitted or acquiesced in it must be found from other sources.

Wesley G. Palmer testified:

"*Q.* In other words you were not supposed to disassemble it?

"*A.* Well, I wasn't I never was told I wasn't, I never was told I was not supposed to disassemble it but I assume I wasn't supposed to unhook it.

"*Q.* You had been in this business long enough to know—

"*A.* That is true.

"*Q.* —that you were not to unhook these 2 pieces of equipment?

"*A.* That is right, it wasn't the policy of the other companies to unhook it.

"*Q.* Didn't you know that that was the policy of this company?

"*A.* I assume that they operated the same as other companies, I didn't know, 1 couldn't, it wasn't in my lease that I couldn't unhook it. But the lease stated this tractor was to be used in its service, in other words for its business. Well, I assume it should not be unhooked, from past experience with other companies. I thought it should be left together.
* * *

"*Q.* When you came towards Whigville you knew and knew even before you got there, that you were going to disconnect that trailer from the tractor and use the tractor for your personal business, you knew that you were not supposed to do so is that right?

"*A.* I was told I could use the tractor to go to and from work.

"*Q.* But you knew you were not going,—to and from work from where?

"*A.* No place in particular,—that would be my work, I was at Whigville when I left my trailer, that would be going from work home.

"*Q.* From work home?

"*A.* That is correct. In other words I felt I had a right to unhook it for the purpose of using the tractor to get to my home."

Edward Wiederhold, a member of the partnership, testified:

"Well, I talked to him at the first meeting, he asked about insurance on his tractor and I advised him, told him then that the boys buy today what they call bobtail insurance. As I understand it, it is insurance issued only when you are unhooked off of an operation of this type with the tractor going home or you may be using it on a Sunday afternoon but it is

for your own use. There was conversation with reference to this, about his personal use of this tractor. I told him that at no time would he use it for his own use. That is the reason we have a lease drawn up so we have the sole right of direction of it after the man has gone out of our sight. I told him at no time can he use this tractor while it is leased to us, for his own benefit, his own use. There was other further conversation with reference to the method of operation of this tractor. It is to be at Elkton, Michigan. It was to be stationed at Elkton. His wife picked him up with the car and he left. Well, I explained it to him to the best of my ability that we did not cover the tractor when it is unhooked from our trailers,—or, trailer. I told him something about where the tractor was supposed to be when it is not hauling the trailer. It was either to be in our terminal or it was to be hauling freight for us. At our terminal or hauling freight for us.    *   *   *

"He asked us if at any time he was near his home if he could take the trailer and stop by his house and of course we have no objection to that.

"*Q.* Is there any condition of your not objecting to it?

"*A.* If the tractor and trailer combination were kept together and he watched it. They have to be hooked up. Then he can go home by permission, I say. I told him that. When he picked up the first load. That he could take the trailer and tractor home but he was not to disconnect them, I told him that.
*   *   *

"*Q.* Did I understand from your prior testimony that you told Mr. Palmer if he would secure bobtail insurance then you would permit him to disconnect the tractor from the trailer?

"*A.* I did not really put it that way, I said it would be better for him to have bobtail insurance but at no time did we wish to have the tractor disconnected from the trailer. There are times when Mr. Palmer himself came in to Elkton and would have to have his wife pick him up whereas if he had bobtail in-

surance he could leave the trailer at our yard and could take his own tractor home for the week end. I would permit him if he had this bobtail insurance to take it home for the week end. To drive home.
* * *

"If at any time when Mr. Palmer was given permission by me to stop at his own home en route with reference to between points of shipment, I did not give him permission to unhook that tractor to use for his own personal business."

It clearly appears from the testimony of Wiederhold that Palmer was never given permission to unhook the tractor to use for his own personal business, and it also clearly appears that at the time of the collision Palmer was not in the performance of any duty for his employer. The most that can be said of Palmer's testimony, "I felt I had a right to unhook it for the purpose of using the tractor to get to my home," is that of a mere supposition on his part, nowhere does he say that Wiederhold gave any such permission. We conclude that at the time of the collision Palmer was not acting within the scope of his employment.

In *Gray* v. *Sawatzki*, 272 Mich 140, 143-145, we said:

"The doctrine of the liability of an owner of an automobile, while being used by a servant, for damages sustained by a third party is annotated and discussed at length in 22 ALR 1397, 45 ALR 477, and 68 ALR 1051. The rule seems well established that, in order to hold the master or employer liable for the negligent operation of his car by his servant or employee, it must appear that he was using it for a purpose within the scope of his employment. A deviation from the route ordinarily taken in the performance of his duties, usually termed 'slight,' for a purpose of his own, will not relieve the employer if at the time of the accident he has returned thereto. *Murphy* v. *Kuhartz*, 244 Mich 54.

"The question here presented is not one of deviation from the route, but whether the employee had not abandoned his duties when he parked the truck near the apartment and entered it and remained there with his wife for more than 6 hours, under an arrangement made between them before they left their home, and had not resumed them when he was later driving the truck in which he and his wife were riding on the way to their home on Sunday morning.
*     *     *

"In *Riley* v. *Roach,* 168 Mich 294, 307, 308 (37 LRA NS 834), this Court said:

" 'The test of the liability of the master for his servant's acts is whether the latter was at the time acting within the scope of his employment. The phrase "in the course or scope of his employment or authority," when used relative to the acts of a servant, means while engaged in the service of his master, or while about his master's business. It is not synonymous with "during the period covered by his employment." ' "

If we assume that Palmer had permission to unhitch the tractor for the purpose of taking it to his home in Birch Run, he abandoned his employment by taking a circuitous route to his home, stopping in bars and driving his brother to a different section of Flint to find his car.

We conclude that under the lease the relationship of employer and employee existed; that Palmer was not within the scope of his employment at the time of the accident as he had abandoned his employment prior to the accident. The judgment against the partnership should be reversed, with costs to defendant partnership.

CARR, J., concurred with SHARPE, J.

EDWARDS, J. Since 1915 we have had in Michigan a law known as the owner liability law. CLS 1954,

§ 257.401 (Stat Ann 1952 Rev § 9.2101). Some have described it as a harsh statute. Briefly, it imposes on the owner of an automobile the liability for damages to one who has been injured by the negligence of a driver to whom the owner has entrusted his automobile. In the first case which upheld the constitutionality of this act, after referring to the automobile in the hands of a reckless driver as a "destructive agency," this Court said:

"If the owner of such agency consents to turn it over to the control of an incompetent or reckless chauffeur he is not deprived of any legal right by holding him liable for its negligent operation when in such control and a greater degree of safety to the general public is likely to follow." *Stapleton* v. *Independent Brewing Co.*, 198 Mich 170, 175 (LRA 1918A, 916).

Since *Stapleton,* many drivers have been entrusted with automobiles. There have been many accidents and many lawsuits. There have been many opinions of this Court.

Generally, this Court has given the statute its intended effect as described above. But in those cases (like the one currently before us) where the owner of the automobile was also the employer of its driver, some confusion has developed as to whether the Court should apply the terms of owner liability statute or the older common-law doctrine of master and servant.

The cases which we have before us require us to attempt a re-examination.

These cases arose out of a collision, May 31, 1953, between a truck tractor, driven by Wesley G. Palmer, and a Pontiac driven by appellee, Clifford Moore, and occupied, also, by his wife, Mrs. Gladys Moore, their daughter, Jean Moore, and Mrs. Hattie Flowers, aunt of Mrs. Moore. All of the occupants of the Pontiac were injured and all filed suits against the

driver, Palmer, and Philip G. Wiederhold and Edward E. Wiederhold, doing business as Wiederhold Freight Lines. The cases were consolidated and tried before a jury which found for each of the plaintiffs in a separate amount and against all of the named defendants. No answer appears in the record for Wesley G. Palmer and he does not appeal. The Wiederholds answered, denied liability, and have appealed.

No issue is raised as to the amounts of the verdicts, nor as to contributory negligence on the part of Clifford Moore, who was the driver of the Pontiac, and no contention is made, on appeal, that Wesley G. Palmer was not guilty of negligence.

It does not seem necessary to describe in detail the accident, nor the injuries, which were serious for Moore and somewhat less for the other parties, appellees. It was a not unusual collision at an intersection on Fenton road, about 7 p.m., in clear daylight, slightly raining with the streets wet and slippery. Palmer was driving about 40 miles per hour, he was on the wrong side of the road, he had just left a tavern where he had drunk several bottles of beer, and his heavy G.M.C. tractor skidded and crashed into the left front of Moore's car, practically demolishing it and causing the injuries complained of and found by the jury. Palmer was subsequently tried and convicted of felonious driving as a result of the accident.

Palmer had bought the tractor for the purpose of hauling freight for the Wiederholds and almost immediately entered into what defendants called a "lease", dated April 8, 1953, as well as a contract of employment.

The lease is termed "exhibit E" and the defendant, Edward Wiederhold, testified:

"It (exhibit E) *was furnished to me by the head man of the motor transit division of the State of*

*Michigan,* Lansing, Michigan. The head man is W. S. King. He controls that operation. Mr. King is an official of the Michigan public service commission."

"WIEDERHOLD FREIGHT LINES
"Elkton, Michigan
"Phone Birch Run 2957

"Lease between Wiederhold Freight Lines with offices and principal place of business at Elkton, Michigan, party of the first part and Wesley G. Palmer, party of the second part.

"Witnesseth as follows:

"1. First party hereby engages and leases from second party for use in its service as a limited common carrier within the described equipment.

"No. 598; Make, GMC; Type, Tract; Serial, MDCR 611166; Year, '50; License, 5082 CC to be used by first party in transporting freight and merchandise.

"2. First party agrees to pay second party 70% less insurance.

"3. In case the second party's services shall be engaged as driver of the said equipment, compensation therefor shall be paid by the first party at a minimum rate of none. Such rate when once established shall not be changed without 5 days' written notice. In such cases the party of the second part shall be deemed an employee of said first party and shall be entitled to all rights and privileges as an employee. First party hereby expressly assumes all duties and liabilities of an employer.

"4. This lease agreement may be cancelled by either party at any time upon 15 days' written notice. In such written notice of cancellation shall be deemed given when delivered personally or by registered mail to either party at their address appearing below. Whenever said notice of cancellation is served on either party, he shall make final settlement and payment of any sum or sums due. Said payment must be made on or before the 15-day limitation herein referred to.

.  "5. It is specifically agreed and understood between the parties hereto that second party, in leasing and furnishing the equipment, described in this contract for operation by the first party, shall not in any way control the use of operation of such equipment, and that the first party shall have complete control of such equipment. It is further understood and agreed that the first party expressly assumes all legal liabilities which may arise as though in fact said equipment was owned by the said first party.

"6. This lease agreement is deemed to have been executed in the State of Michigan as a bonified (*sic*) contract, and construed in all things in accordance with the laws and decisions of that State.

"In witness whereof, first party has caused this lease agreement to be executed by its duly authorized agent and second party has annexed his name this 8th day of April, 1953.

<div style="margin-left:3em">

"Wiederhold Freight Lines<br>
"S/        Wiederhold<br>
"Party of the first part<br>
"Elkton, Michigan<br>
"Address<br>
"S/ Wesley G. Palmer<br>
"Party of the second part<br>
"Birch Run, Michigan<br>
"Address

</div>

"Witnesses:<br>
"S/ ............<br>
" ..............."

On appeal there is no issue raised as to the personal liability of the defendant Palmer, nor as to the amount of damages. Palmer has not appealed, relying, we assume, on the last sentence in the fifth paragraph of the "lease" reading, "It is further understood and agreed that the first party (the Wiederholds) expressly assumes all legal liabilities which may arise as though in fact said equipment was owned by the said first party." The Wiederholds appeal, and allege:

1. That they were entitled to an instructed verdict on the ground that the driver of the tractor was not acting in the scope of his employment or authority when the accident occurred.

2. That it was error for the court to charge that it might find appellants liable under CLS 1954, § 257.401 (Stat Ann. 1952 Rev § 9.2101).

3. That it was error not to grant a mistrial where insurance was improperly injected into the case by the plaintiffs.

At the outset we hold that defendants Wiederhold must be treated as the owners of the truck which was involved in this accident. The lease provides for them to assume "all legal liabilities which may arise as though in fact said equipment was owned by the said first party (Wiederhold)."

These terms apparently were required by the public service commission and must be held to run to the benefit of the public.

In addition, the lease was for more than 30 days and, hence, the lessee must in any event be held to be the "owner" under the definition of that term in the motor vehicle code, section 37.

" 'Owner' means: (a) Any person, firm, association or corporation renting a motor vehicle or having the exclusive use thereof, under a lease or otherwise, for a period of greater than 30 days." CLS 1954, § 257.37 (Stat Ann 1952 Rev § 9.1837).

We believe, also, that defendants' contention that Palmer was the employee of Wiederholds on the date of this accident is borne out by the lease and the evidence contained in the record.

In essence, plaintiffs and appellees here claim that the fact that defendants Wiederhold by lease and statute must be regarded as owner makes the owner liability law applicable; and defendants-appellants contend that Palmer being an employee, defendants

Wiederhold may not be held unless Palmer, at the time of the accident, was within the scope of his employment under the master-servant doctrine.

The language of the statute makes no mention of such an exception:

"Nothing herein contained shall be construed to abridge the right of any person to prosecute a civil action for damages for injuries to either person or property resulting from a violation of any of the provisions of this act by the owner or operator of a motor vehicle, his agent or servant. The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of such motor vehicle whether such negligence consists of a violation of the provisions of the statutes of the State or in the failure to observe such ordinary care in such operation as the rules of the common law requires. The owner shall not be liable, however, unless said motor vehicle is being driven with his or her express or implied consent or knowledge." CLS 1954, § 257.401 (Stat Ann 1952 Rev § 9.2101).

Nonetheless we shall deal with defendants' claims on the scope of employment issue first. Defendants-appellants rely, in arguing that Palmer was in truth outside the scope of his employment, upon the following:

That Palmer had unhooked the tractor from his loaded trailer to proceed to his home.

That he had detoured from the most direct route there to visit a bar and have "a couple of beers."

That in resuming his route home he was again on a detour to deliver a passenger to the location of the passenger's car.

And that, finally, none of the above was specifically authorized by the Wiederholds and some they claim to have forbidden.

Mr. Justice SHARPE, in reversing the judgments as to defendants Wiederhold, concludes that Palmer

"abandoned his employment by taking a circuitous route to his home, stopping in bars and driving his brother to a different section of Flint to find his car." Since this issue is presented in relation to appellants' claimed right to a directed verdict, we view the facts from the point of view favorable to plaintiffs since that apparently is the view the jury took. *Peyton* v. *Delnay,* 348 Mich 238; *Hulett* v. *Great Atlantic & Pacific Tea Co.,* 299 Mich 59; *Anderson* v. *Kearly,* 312 Mich 566; *Titus* v. *Lonergan,* 322 Mich 112; *Cramer* v. *Dye,* 328 Mich 370.

Palmer testified, "I was told that I could use this tractor to go to my home from my work and back." He testified further, "On these trips that I took for Wiederhold Freight Lines, I decided what route I should follow. And I paid for the fuel and cylinder oil used in operating my tractor." The brother testified (this testimony is not disputed) that he was to be dropped off, on the trip up US-23 from the Glocca Morra cafe toward Birch Run, at the intersection of "Vienna road and the Dixie out there, US-10." (Parenthetically, this intersection is not in Flint. It is some 8 to 10 miles north of the northernmost Flint city limits on combined US-10 and US-23, and is on the most direct route from the Glocca Morra cafe to Birch Run.) The only remaining question, then, is whether Palmer—starting at Whigville toward Birch Run—pursued "a circuitous route" toward his home.

Above premises and landmarks considered, we find Palmer at Whigville with an interstate load of fertilizer due for delivery at the North Branch elevator. It was Sunday. There was and had been no opportunity for previous delivery of the load at North Branch. During the trip north from Toledo, and prior to reaching Whigville, Palmer had called Wiederhold to determine whether the elevator at North Branch would be open that day (Saturday, May 30,

1953—Memorial Day). The time of the call was between 1 and 2 o'clock in the morning of May 30th and it resulted in advices (Wiederhold to Palmer) that "I didn't think they would be open," and that "he would have to deliver it Monday."

Whigville lies south southeast of Birch Run (with Flint directly between) and southwest of North Branch. The most direct trunk-line route, from Whigville to North Branch, is northeast. The direct trunk-line route from Whigville to Birch Run—where Palmer proposed to stay (at his home) until Monday morning—lies among alternative and approximately equidistant routes through Flint leading finally to the point of joinder, north of Flint, of US–10 and US–23. Palmer followed one of them—US–10 north to Bristol road (M–121); west on Bristol 1 mile to US–23, and north on US–23 to the point of collision. On the trip just outlined he came to the Glocca Morra cafe, stopped there, and picked up his brother for transportation to the intersection identified above. Palmer himself testified about the route he chose, "it is a route that could be used,—one of half a dozen." We see no reason for directing a verdict here, and hold that the question of circuity of route was at best one for the jury.

The trial judge, however, did not submit the question of whether or not Palmer was at the time of the accident "within the scope of his employment." Rather, he employed the statutory language in his charge, and the jury apparently found that at the time of the accident Palmer was driving the vehicle with "the express or implied consent or knowledge" of defendants Wiederhold. In view of the instruction given by the trial judge, omitting any reference to "scope of employment," our next question becomes: Where the trial judge did not submit this issue does that fact require a new trial as requested by appellants?

To answer this requires us to review the history and interpretation of the owner liability act from its origin down to date.

Employer-owner liability for the negligent acts of his employee-driver existed in Michigan at common law before the passage of any owner liability statute. At this same time lender-owners generally could not be held for the negligent acts of the drivers of their automobiles. *Hartley* v. *Miller,* 165 Mich 115 (33 LRA NS 81, 1 NCCA 126). At common law, however, since the liability grew exclusively out of the employer-employee relationship, liability was strictly limited to cases where the employee was clearly within the scope of his employment. *Riley* v. *Roach,* 168 Mich 294 (37 LRA NS 834).

The above cases concerned accidents before the effective date of the 1909 owner liability act, the rule being stated in the latter as follows:

"The test of the liability of the master for his servant's acts is whether the latter was at the time acting within the scope of his employment. The phrase 'in the course or scope of his employment or authority,' when used relative to the acts of a servant, means while engaged in the service of his master, or while about his master's business. It is not synonymous with 'during the period covered by his employment.' " *Riley* v. *Roach, supra,* 307, 308.

Identical holdings as to law may be cited from *Loehr* v. *Abell,* 174 Mich 590; *Barry* v. *Metzger Motor Car Co.,* 175 Mich 466; *Brinkman* v. *Zuckerman,* 192 Mich 624, all of which concerned accidents after the effective date of the 1909 act—but also after it had been held unconstitutional—and before the effective date of the 1915 statute.

The first attempt by the legislature to make automobile owners generally responsible for the negligent acts of their drivers made the legislative intent crystal clear.

PA 1909, No 318, § 10, subd 3:

"The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of any person of such motor vehicle, whether such negligence consists in violations of the provision of a statute of this State or in the failure to observe such ordinary care in such operation as the rules of the common law require; but such owner shall not be so liable in case such motor vehicle shall have been stolen."

Briefly, the statute held an owner liable for his driver's negligence in all cases except where the car was stolen.

In *Johnson* v. *Sergeant*, 168 Mich 444, 447 (2 NCCA 334), this Court upheld the constitutionality of the act and said:

"The legislature has gone a long way in this statute in fixing the liability of the owner, even though he may not be in fault. We do not think, however, it can be said to have exceeded its authority under the police power."

When, however, *Daugherty* v. *Thomas*, 174 Mich 371 (45 LRA NS 699, Ann Cas 1915A, 1163), presented another fact situation where there was no indication that the owner even knew of the driving which resulted in the accident, this Court overruled *Johnson* v. *Sergeant* and held the 1909 owner liability act unconstitutional largely because in the same year the legislature had passed an act making it a crime to take an automobile without authority but without intent to steal. PA 1909, No 33* (CL 1948, § 750.414 [Stat Ann § 28.646]). Thus the owner liability act of 1909 might have held an owner liable for the criminal taking of a car from his possession without

---

* The substance of this has been incorporated subsequently into our penal code.

his knowledge or consent and the negligent act of the taker which followed.

This Court did not, however, move far from *Johnson* v. *Sergeant,* saying:

"We have not here the question of the responsibility, be it moral or otherwise, of the owner of an automobile who has placed it in the hands of an irresponsible person to use." *Daugherty* v. *Thomas, supra,* 379.

and (p 390):

"Had this provision of the statute been followed by language indicating that the owner should not be liable in case the automobile or other motor vehicle was taken or used in violation of PA 1909, No 33, the infirmity would have been cured. The remainder of the act seems unobjectionable."

In PA 1915, No 302, § 29, the legislature, modeling its action on the opinion quoted above, adopted a statutory provision which is substantially identical with the present wording of the owner liability act.

Promptly, in *Stapleton* v. *Independent Brewing Co., supra,* this Court upheld the constitutionality of the act, saying (pp 174, 175):

"Acting strictly along the lines suggested in this [*Daugherty* v. *Thomas*] opinion the legislature in 1915 enacted Act No 302, § 29 (CL 1915, § 4825), containing the following:   *   *   *

" 'The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of such motor vehicle:   *   *   *   *Provided,* That the owner shall not be liable unless said motor vehicle is being driven by the express or implied consent or knowledge of such owner.'

"It is true that the automobile has become so perfected that it may not be classed as a 'dangerous instrumentality' when intelligently managed. It will not shy, balk, back up, or run away when properly

directed, but may do all of these when managed by an inexperienced, incompetent, or reckless driver. When in the control of such a one it becomes an exceedingly destructive agency as the daily toll of lives and the many injuries to persons chronicled by the newspapers attest. *If the owner of such agency consents to turn it over to the control of an incompetent or reckless chauffeur he is not deprived of any legal right by holding him liable for its negligent operation when in such control and a greater degree of safety to the general public is likely to follow.*" (Emphasis supplied.)

From *Stapleton* down to date there have been numerous cases presented, considered and decided by this Court concerning fact situations of all sorts wherein the statutory test of express or implied consent or knowledge has been considered.

In the following cases the statutory language has been approved as the test of owner liability: *Hatter* v. *Dodge Brothers,* 202 Mich 97; *Kerns* v. *Lewis,* 246 Mich 423; *Scott* v. *Wallace,* 251 Mich 28; *Barnum* v. *Berk,* 256 Mich 363; *City of St. Joseph* v. *Grantham Motor Sales,* 269 Mich 260; *Rabaut* v. *Ford Motor Sales Co.,* 285 Mich 111; *Wingett* v. *Moore,* 308 Mich 158; *Monaghan* v. *Pavsner,* 347 Mich 511. It should be noted that in *Hatter* the driver was an employee of the owner, while the balance of the cases deal with situations where drivers borrowed cars from the owners.

Representative quotations from these are as follows:

"Aside from this, as the law now stands, it is not a prerequisite for recovery to prove that the motor vehicle causing an injury was being operated in the business of the owner, for his use and enjoyment, or by his servant or employee." *Hatter* v. *Dodge Brothers, supra,* 101.

"The statute makes the owner liable if the 'motor vehicle is being driven with his or her express or implied consent or knowledge,' and we cannot read into it the restriction that the particular driver must be known by and his driving consented to by the owner. The statute may be drastic, but we cannot render it less so by any permissible construction." *Kerns* v. *Lewis, supra,* 425, 426.

"Whether automobile was being driven by brother-in-law of owner with his express or implied consent or knowledge at time of accident so as to render him liable under CL 1915, § 4825, as amended by PA 1927, No 56, *held,* question for jury under evidence." *Scott* v. *Wallace* (syllabus 2), *supra.*

"In action for death of plaintiff's decedent due to collision with defendant's automobile, there was no error in submitting to jury question of whether car was being driven with defendant's consent, either express or implied, under circumstances." *Barnum* v. *Berk* (syllabus 3), *supra.*

"Nor does the statute create illegal operation without knowledge of the owner a defense open to the latter. If it did, the statute would be of little force because, substantially, all negligence in driving a motor vehicle on the highways involves violation of law. The statute is clear, salutary, and ought not to be emasculated by exceptions." *City of St. Joseph* v. *Grantham Motor Sales, supra,* 265.

The authorities cited above make it seem clear that the owner liability act justified the trial judge in the instant cases when he submitted the key instruction complained of here:

"Before you can find the Wiederholds liable in this case you must find that at the time of this accident Wesley Palmer was driving this vehicle with the express or implied consent or knowledge of the Wiederholds."

There is, however, an impressive list of cases which can be compiled from which language can be quoted to hold a contrary point of view. Among these, appellants rely upon *Riley* v. *Roach, supra; Brinkman* v. *Zuckerman, supra; Hooks* v. *Western & Southern Life Ins. Co.*, 268 Mich 421; *Vitaioli* v. *Berklund*, 296 Mich 56.

My Brother's opinion also relies strongly on the *Riley Case*, closing with a quotation therefrom. As has been noted above, however, this case concerned an accident which happened *before* the effective date of the original owner liability act of 1909. (See *Riley* v. *Roach, supra,* footnote 1, p 294.) Hence, it can hardly be held to be authority as to rights under that act. Much the same situation prevails in relation to the *Brinkman Case*. Although it is cited in Michigan Statutes Annotated under the owner liability statute (Stat Ann 1952 Rev § 9.2101, note, pp 139, 140), the accident discussed therein occurred April 17, 1915, in the interim between the time the 1909 act was declared unconstitutional (*Daugherty* v. *Thomas, supra*) and the effective date of the 1915 act. CL 1915, §§ 4825, 4832 (effective January 1, 1916).

In the *Hooks* and *Vitaioli Cases* the defendant employer did not own the automobile at all and the cases, hence, have no application to the owner liability act. The same fact situation distinguishes *Nevins* v. *Roach*, 249 Mich 311, which is frequently cited and relied upon in owner liability cases.

If the cases cited above may be clearly distinguished from the instant case, the same cannot be said for all cases which counsel for defendants call to our attention. His brief and our re-examination of the topic indicate that in the following cases this Court has held under fact situations suitable for invoking the owner liability act (and where the owner was also the employer) that the preceding com-

mon-law test of scope of employment was the correct one. *Gray* v. *Sawatzki,* 272 Mich 140; *Foote* v. *Huelster,* 272 Mich 194; *Kieszkowski* v. *Odlewany,* 280 Mich 388; *Kalinowski* v. *Odlewany,* 289 Mich 684; *Jeffries* v. *Jodawelky,* 304 Mich 421; *Freeza* v. *Schauer Tool & Die Co.,* 322 Mich 293.

And in *Geib* v. *Slater,* 320 Mich 316, and *Riser* v. *Riser,* 240 Mich 402, 404 (27 NCCA 518), this Court in discussing this statute quoted language purporting to originate in an Iowa case (*Maine* v. *James Maine & Sons Co.,* 198 Iowa 1278 [201 NW 20, 37 ALR 161]) :

" 'The liability of the owner of a motor vehicle for damages caused by the negligent operation thereof by another person, rests upon the doctrine of agency, express or implied.

" 'The liability is based upon the doctrine of *respondeat superior.*'" *Geib* v. *Slater, supra,* 320.

We have read this Iowa case with interest and fail to find therein the same words in the same context. It is true that that case does speak of the Iowa owner liability statute as *an extension* of the *respondeat superior* doctrine. But it goes on to state (p 1282) :

"The statutory liability depends upon two things : the consent of the owner to the use of the car by the driver, and the negligence of the driver."

In upholding these statutes, most of the States, with Michigan well in the lead, have planted the constitutionality of the enactment squarely upon the police power of the State and the public's need for protection from automobiles in the hands of reckless drivers. *Stapleton* v. *Independent Brewing Co., supra; Hatter* v. *Dodge Brothers,* 202 Mich 97; *Atkins* v. *Hertz Drivurself Stations, Inc.,* 261 NY 352 (185 NE 408), affirmed, 291 US 641 (54 S Ct 437, 78 L ed 1039); *Feitelberg* v. *Matuson,* 124 Misc 595 (208 NYS

786); *Merchants & Planters Bank* v. *Brigman,* 106 SC 362 (91 SE 332, LRA1917E, 925); *Holmes* v. *Lilygren Motor Co.,* 201 Minn 44 (275 NW 416); *Young* v. *Masci,* 289 US 253 (53 S Ct 599, 77 L ed 1158, 88 ALR 170). See, also, Harper and James, "The Law of Torts," § 26.16, p 1424; annotation, 8 NCCA NS 18; annotation, 135 ALR 481; annotation, 159 ALR 1309.

In the last case cited, Mr. Justice Brandeis, for a unanimous United States supreme court, in discussing and upholding the New York owner liability act, said:

"The power of the State to protect itself and its inhabitants is not limited by the scope of the doctrine of principal and agent. The inadequacy of that doctrine to cope with the menacing problem of practical responsibility for motor accidents has been widely felt in cases where the injurious consequences are the immediate result of an intervening negligent act of another." *Young* v. *Masci, supra,* 259.

The owner liability statutes were aimed at situations in which the common law was helpless. While they were not passed as a substitute for the common law, they were adopted to complement the common law. As Mr. Justice Cardozo put it in his case of *Grant* v. *Knepper,* 245 NY 158, 164 (156 NE 650, 54 ALR 845), "Passing from common law to statute, we find the owner's liability not merely continued, but extended." If a situation arises where, for some reason, the employee is held to be outside the scope of his employment, it is quite possible that he is still within the express or implied consent to operate given to him by the owner of the vehicle.

The Rhode Island supreme court in a leading case said the following about a similar statute:

"The evident purpose of this new statute is to safeguard the public from the negligent operation of

any motor vehicle and to make the owner liable for injury caused thereby if the operation is with his consent. The effect of the act is to extend the common-law liability of one who consents to the use by another of a motor vehicle which he owns or legally possesses. A motor vehicle when operated negligently becomes a dangerous instrumentality. The underlying idea of this enactment doubtless is that the person who has allowed another to use such a vehicle should not be permitted to escape responsibility for its improper use. Liability of the owner in case of accident is now established if the use or operation is with his consent. If the owner's consent, either express or implied, is proved, it is no longer a defence in case of accident that the servant or agent to whom the use or operation of the vehicle has been intrusted has temporarily departed from the course of his employment or the scope of his agency." *Guerin* v. *Mongeon,* 49 RI 414, 416 (143 A 674, 675).

See, also, *Baker* v. *Rhode Island Ice Co.,* 72 RI 262 (50 A2d 618); *Burgess* v. *Cahill,* 26 Cal2d 320 (158 P2d 393, 159 ALR 1304); annotations, 159 ALR 1309: 13 ALR2d 378.

Michigan has not been without exponents of this plainly majority view. At the point of this Court's widest deviation from the intended purpose of the statute, Justices Potter and McAllister warned:

"This Court has never declared this statute unconstitutional. It says the owner shall not be liable unless the motor vehicle is being driven with his or her express or implied consent or knowledge. The statute imposes liability if the owner lets the employee take the motor vehicle and such liability attaches whether the employee did what he was told to do with the motor vehicle or not. The decisions of this Court in interpreting this statute (which in no way recognizes the common-law doctrine of master and servant) have written into the statute an excuse of the owner from liability in case his employee deviates

from the usually traveled route for his own business or pleasure, holding such employee is thus outside the scope of his employment and the owner of the vehicle is not liable for the failure to observe ordinary care in the operation thereof under such circumstances.  It would be just as logical to further emasculate the plain provisions of the statute and hold the owner and employer is liable only when the motor vehicle in the hands of his employee is operated as directed by the employer, and if the employee is directed not to operate the motor vehicle negligently and injury results from negligent operation, the owner and employer be not liable therefor because the employee was violating the directions of his employer, acting outside the scope of his authority, and, though he failed to observe ordinary care in the operation of such motor vehicle, the employer is not liable.

"We are dealing with the language of a statute. Prior to the enactment of any statute in this State governing liability for the negligent operation of motor vehicles on the public highways, the common law prevailed.  An owner of a motor vehicle was not liable for the negligence of a person to whom he had loaned it, whether that person was a member of his family, his servant on a personal errand, or a stranger.  Liability would attach to the owner only where the vehicle was in operation on the owner's business. In other words, the driver had to be the servant or agent of the owner and at the time of the accident acting within the scope of his employment.  The increase in the number of accidents resulting from the operation of motor vehicles, many of which caused serious personal injuries and frequently resulted in death, challenged the attention of the legislature to the fact that generally the driver of the commercial motor vehicle whose negligence caused the accident was financially irresponsible and the financially responsible owner escaped liability on some technical claim such as that the car was loaned for a specific purpose while at the time of the accident it was being

used for another purpose. 19 Boston Univ L Rev, p
448. As a result, the legislature took action.

"The true interpretation of this statute is that
" 'If the owner's consent, either express or implied,
is proved, it is no longer a defense in case of acci-
dent that the servant or agent to whom the use or
operation of the vehicle has been intrusted has tem-
porarily departed from the course of his employment
or the scope of his agency.' (*Massart* v. *Narragan-
sett Electric Co.*, 54 RI 154, 157 [171 A 238].)
"for the reason:
" 'The statute abrogates the defense of deviation
from route or scope of employment when the servant
is operating the automobile with his master's con-
sent.' *Massart* v. *Narragansett Electric Co.*, *supra*,
159." *Kalinowski* v. *Odlewany*, 289 Mich 684, 695–
697.

In a recent decision bearing on the owner liability
act, this Court unanimously declared:

"Appellants contend further that the owner here
is not liable for wilful and wanton misconduct of the
operator because at common law under the *re-
spondeat superior* doctrine a wanton violation of the
law was held to place a servant outside the scope of
his master's service.

"The statute we interpret here is not a derivative
of the *respondeat superior* doctrine. It is a measure
adopted by the legislature to promote public safety
by holding automobile owners accountable for cer-
tain negligent acts of the persons to whom they en-
trust their automobiles. *Johnson* v. *Sergeant*, 168
Mich 444 (2 NCCA 334); *Stapleton* v. *Independent
Brewing Co.*, 198 Mich 170 (LRA1918A, 916). It
would be a strange construction of such a statute to
hold an owner for the ordinary negligence of the
person whom he allowed to drive his car and free him
from liability if his chosen driver was found guilty
of gross negligence or wilful and wanton miscon-
duct." *Peyton* v. *Delnay*, 348 Mich 238, 248, 249.

We now reiterate. The Michigan owner liability act, CLS 1954, § 257.401 (Stat Ann ·1952 Rev § 9.2101), is an enactment founded upon the police power of the State. Its obvious purpose is to make owners of automobiles liable for ·the negligent acts of those to whom they entrust their vehicles. Liability under the statute is not limited by the common-law tests applicable to the master-servant relationship. The fact that a common-law action under the master-servant doctrine preceded the statute (and still exists) does not create any exception from the terms of the statute in favor of employers as a class.

The statute carries within it its own test as to owner liability: Whether "said motor vehicle is being driven with his or her express or implied consent or knowledge." CLS 1954, § 257.401 (Stat Ann 1952 Rev § 9.2101). These were the very words which the trial judge employed in our present · cases and which are the subject of appellants' complaint. We hold that they were correctly employed.

Further to attempt some clarification of the long and confusing history we have recited, we hold that the language referred to in *Geib* v. *Slater, supra,* and *Riser* v. *Riser, supra,* holding the Michigan owner liability act to be based upon the doctrine of *respondeat superior* is expressly overruled. So, too, is any language in the *Gray, Foote, Kieszkowski, Kalinowski, Jeffries,* and *Freeza Cases, supra* (or any others not currently before us) which directly, or by implication, seems to say that the statutory test of "scope of knowledge or consent, express or implied," may not be used in cases under the owner liability statute where the owner of an automobile is also the employer of the driver.

Appellants also seek a new trial on the ground that plaintiffs "injected insurance" into the cases. The lease, which is a central fact in these lawsuits, contained the words, "First party agrees to pay second

party 70% less insurance." Under the varying theories of an employer-employee relationship (defendants') and coadventure (plaintiffs'), it was inevitable that some inquiry should be made about this phrase. It may be that counsel for plaintiffs pursued it further than was warranted but under all the circumstances we do not find prejudicial error. *Morris* v. *Montgomery,* 229 Mich 509.

The judgments of the court below are affirmed, with costs to appellees.

SMITH, VOELKER, and BLACK, JJ., concurred with EDWARDS, J.

KELLY, J. (*concurring*). Defendant Palmer testified:

"I was told I could use it to go to and from work. Well I assumed that was home, to and from work. In other words I was told that I could use this tractor to go to my home from my work and back. And I was told that."

Defendant Edward Wiederhold testified:

"He (Palmer) asked us if at any time he was near his home if he could take the trailer and stop by his house and of course we have no objection to that.
\* \* \*

"Well, I talked to him at the first meeting, he asked about insurance on his tractor and I advised him, told him then that the boys buy today what they call bobtail insurance. As I understand it, it is insurance issued only when you are unhooked off of an operation of this type with the tractor going home or you may be using it on a Sunday afternoon but it is for your own use."

I am concurring with Justice EDWARDS' opinion because I believe the record establishes facts calling for a determination by a jury and, secondly, because

defendants' rights and interests were properly protected by the court in the following instruction given by the court to the jury:

"Now if you find—even if you find that Palmer was negligent and that his negligence was the proximate cause of this accident and injury, and the plaintiffs themselves were free from contributory negligence—if you should also find that Wiederhold did not give to Palmer consent to drive that tractor while disconnected, then in such case the Wiederholds would not be liable, but if, on the other hand, you do find the elements necessary to find Palmer liable and you further find that Palmer was given consent by the Wiederholds to drive that tractor while disconnected, as Mr. Palmer testified, then the Wiederholds would only be liable if at the time of the accident Palmer was driving within the terms that Wiederhold has consent to. The consent, according to Palmer's testimony was to use the tractor to and from home and work. If you find such consent it would be for you to determine whether at the time of the accident he was driving the tractor for that purpose and reasonably in pursuance of that consent. He would not be driving with Wiederhold's knowledge or consent if at the time he was not driving reasonably within the meaning of the consent which had been granted him. If he should depart for his own purposes from the consent use he would not be liable while so departing from the consented use. If he goes outside the consent or permission, that is, permission to use the tractor to and from his home and work, if he goes outside of that consent and if at the time of the accident he was outside of that consent, the Wiederholds would not be liable. You may take into consideration all the circumstances which you find to be true in considering whether or not at that time—if you find there was consent to use the tractor to and from work—whether or not at that time, at the time of the accident he was so using the tractor. You may take into consideration all the evidence in-

cluding the kind of equipment, the lease, and all the other evidence which you find bears upon that question, in determining that question. If he was not driving reasonably within the granted consent, as for instance if he had gone on a personal or independent joy ride of his own or if he was not on his way home from work, he wouldn't be within the consent."

DETHMERS, C. J., concurred with KELLY, J.