**TRANSPORT INSURANCE COMPANY,**
a Texas Corporation, Plaintiff,

v.

**MICHIGAN MUTUAL LIABILITY IN-SURANCE COMPANY, a Michigan
Corporation, Defendant.**

**Civ. No. 29503.**

United States District Court,
E. D. Michigan, S. D.

March 21, 1972.

William P. Cooney, Detroit, Mich., for plaintiff.

Lawrence A. Bohall, Detroit, Mich., for defendant.

## FINDINGS OF FACT
## CONCLUSIONS OF LAW

DeMASCIO, District Judge.

This dispute between two insurance companies spans more than a decade and finally culminated in one challenging the good faith of the other. The plaintiff Transport Insurance Company (Transport) is the insurer for Allied Van Lines, Inc. Transport also insured William Dolan Frost and Phyllis Frost, d/b/a Frost Moving and Storage Company, when and only when Frost *was engaging* in the business of Allied Van Lines, Inc., Allied Van Lines, Inc., of Indiana, and Allied Van Line Terminal Company. The defendant Michigan Mutual Liability Insurance Company (Michigan Mutual) insured William Dolan Frost and Phyllis Frost, d/b/a Frost Moving and Storage Company. Michigan Mutual also insured Allied Van Lines, Inc., against liability "as a result of an occurrence arising out of operations conducted by the named insured (Frost) while *not engaging* in the business of Allied. With this insurance setting, the inevitable occurred. Frost was involved in an accident resulting in the death of Emil Ketola. Transport and Michigan Mutual could not agree on whose business Frost was engaged in when the accident occurred. It was necessary to resolve this issue to determine whether Transport or Michigan Mutual was contractually obligated to investigate and defend, settle or pay any judgment rendered against Frost and Allied.

The facts surrounding Frost's accident cannot be seriously disputed:

"In late November 1959, defendant William Dolan Frost had hauled a shipment of freight for Allied Van Lines, Inc., to Florida and then returned to Buffalo, New York, with an Allied Van Lines, Inc., shipment. In Buffalo he was assigned another ship-

ment from Allied Van Lines, Inc., to Minneapolis, Minnesota. He arrived at Minneapolis on Friday, December 4, 1959. He called the Chicago dispatcher of Allied Van Lines, Inc., and was told that there was a shipment going to Royal Oak, Michigan and that it would not be ready for shipment until the next Tuesday, December 8th. The practice of defendant Frost and Allied Van Lines, Inc., that had developed over the years was that defendant Frost could elect to take or refuse a shipment of freight. In the instant case if he wished to return to his home at Sault Ste. Marie, approximately 640 miles from Minneapolis, he could have done so and Allied Van Lines, Inc., would have to secure another vehicle to carry the shipment to Royal Oak. However, defendant Frost elected to take the shipment from Minneapolis to Royal Oak on Tuesday, December 8th. He also had the election of staying at Minneapolis or returning to his home at Sault Ste. Marie.

"Defendant Frost had business to take care of in Sault Ste. Marie where his family lived and which was the headquarters for his business and at Ishpeming, Michigan, where he had a branch office of his business.

"On Monday, December 7, 1959, defendant Frost had an appointment with Morris E. Woodbridge, a procurement officer at the K. I. Sawyer Air Force Base which is located about 15 miles south of Marquette, Michigan. On December 1st Mr. Woodbridge called the wife of William Dolan Frost at Sault Ste. Marie and arrangements were made for her husband to see Mr. Woodbridge at the K. I. Sawyer Air Force Base for purposes of entering into a new agreement for the storage of certain Air Force equipment. This business had nothing to do with the business of Allied Van Lines, Inc., and was entirely personal with William Dolan Frost.

"Defendant Frost elected to return to his home at Sault Ste. Marie and left Minneapolis on Saturday and arrived at Sault Ste. Marie on Sunday about noon. He attended to some of his business on Sunday and on Monday, December 7th, left to go to the K. I. Sawyer Air Force Base.

"When Frost returned to his home he drove his tractor, having stored his trailer in Minneapolis. He intended to return on December 8 to keep his commitment to the Allied dispatcher and deliver the shipment, after it was loaded, to Royal Oak. In order to keep his appointment at K. I. Sawyer Air Force Base to take care of his personal business he selected a route back to Minneapolis which was approximately ten miles further than the more direct route he would have otherwise taken. It was while he was en route to the K. I. Sawyer Air Force Base that the accident occurred." [1]

At all pertinent times, Frost and Allied operated under a lease agreement. In addition, Frost had an agency contract with Allied under which he agreed to make equipment owned by him available to Allied for use in Allied's business at the sole discretion of Frost. The contract also made Frost an agent of Allied and required him to estimate weight, collect charges, pack, crate, load, unload and deliver shipments of household goods for Allied. Frost agreed to perform his employment under Allied's complete and exclusive control, direction and supervision. The lease permitted Allied, a common carrier, to acquire vehicles for transportation of household goods. Under the lease, Frost agreed to furnish drivers and helpers and maintain the vehicles in good repair in compliance with the Interstate Commerce Commission (ICC) requirements. Further, he had the duty to paint the vehicles to comply with ICC regulations. Frost was further obliged to bear the expense of fuel, oil, lubricant, tires and all other expenses including wages of drivers and

1. From appellant's brief—in the Michigan Supreme Court.

helpers. The lease reserved to Allied the exclusive possession, supervision and control over the operation of the vehicles, drivers and helpers, including the time and place of arrival, departure and detention, routing and manner of operation during that period:

> "Provided, however, that at such times during the term of this lease as the lessee [Allied] may not require the said vehicles to be used in the lessee's business, the lessor [Frost] may use the said vehicle or vehicles in its own business."

In addition, the lease further provided that the vehicles when used in the service of Allied would be operated by drivers under the direction and control of Allied, and further the drivers "shall conform to all rules and regulations of the Interstate Commerce Commission . . . ."

The administratrix of the estate of Emil Ketola instituted a state action and joined Frost and Allied as defendants. Transport, upon receiving notice of the suit, investigated the events leading to the accident. Thereafter, Transport tendered the defense of both Allied and Frost to the defendant. The defendant declined plaintiff's initial offer to defend, but eventually entered an appearance for Frost only. During the course of the Ketola trial, Allied requested the court to pose a special question to the jury for a determination of whether Frost was or was not engaged in the business of Allied at the time of the accident. The court refused the request. After due deliberation, the jury returned a verdict of $75,000.00 against both Frost and Allied. Thereafter, the parties moved for a Judgment N.O.V. The trial judge by written opinion held that Allied was liable to the estate under the Owner's Liability Statute,[2] and stated further that whether Frost was "in the scope of his employment returning to Minneapolis on a direct route at the time of the accident" was a jury question. On appeal, the Michigan Supreme Court affirmed the trial court, and held Allied liable as an owner, within the meaning of the Owner's Liability Statute. The Michigan Supreme Court ignored the question whether Frost was or was not acting in the scope of his employment.[3] Therefore, at the conclusion of the state proceedings, a court had not yet ruled on the issue of whether Frost was engaged in the business of Allied when the accident occurred. If Frost were on Allied's business when the fatal accident occurred, Transport's policy would have indemnified both. However, if Frost were not on the business of Allied when the accident occurred, both Allied and Frost would be the insured of the defendant and the defendant's policy would have been primary.

Plaintiff's complaint here charges that Michigan Mutual knew or ought to have known that Frost was engaged in his own business and was not serving any interest of Allied when the accident occurred. Plaintiff further charges that defendant's failure to acknowledge this was an act of bad faith. The bad faith issue was tried to the court. The separate issue of whose business Frost was on when his accident occurred was tried to a jury. What seemed conspicuous to this court from the outset was finally put to rest by a jury. The jury found that Frost was not on the business of Allied when the accident occurred. Allied, as a matter of law, under this jury verdict is entitled to full indemnity from Frost. Plaintiff having paid the judgment is entitled to bring this bad faith action. National Farmers Union Property & Cas. Co. v. Farmers Ins. Group, 14 Utah 2d 89, 377 P.2d 786; Bennett v. Preferred Acc. Ins. Co. of N.Y., 192 F.2d 748 (10th Cir.). An excess insurer having paid the excess loss has been held to be subrogated to the insured's rights against the primary insurer for bad faith refusal to settle. Plaintiff here, having paid the entire judgment, is the real party in interest. American Fidel-

---

2. M.S.A. § 9.2101; M.C.L.A. 257.401.

3. Ketola v. Frost, 375 Mich. 266, 134 N.W. 2d 183.

ity & Cas. Co. v. All American Bus Lines, 179 F.2d 7 (4 Cir.).

We must now decide whether, in the period prior to and after the trial on the Ketola claim, Michigan Mutual acted in "bad faith." If Michigan Mutual knew or ought to have known that Frost was not on Allied's business, it should have accepted the tender of the defense as to both Frost and Allied because it was contractually obliged to do so.

After the accident occurred, Michigan Mutual investigators took statements from Frost and his helper, Forgrave. Michigan Mutual knew that Frost and Forgrave arrived in Minneapolis on December 5th. After Frost unloaded, he called the Allied dispatcher and was told that Allied had another delivery for Michigan but it could not be loaded until December 8th. The dispatcher did not care what Frost did in the interim. He could stay in Minneapolis or go home. Frost and Forgrave talked it over and finally decided to return home rather than layover because:

"(1) We did not have an adequate supply of clothing and toilet articles, (2) it would have cost us almost as much to go home, 526 miles one way, as to layover in Minneapolis, and (3) *most important I had a business appointment* on December 7, 1959, with a U. S. Government Procurement Officer for the K. I. Sawyer Air Force Base *concerning my moving and storage business.*" [4]

Michigan Mutual knew immediately from these statements that it was not the business of Allied that sent Frost forth from Minneapolis to his home in Sault Ste. Marie.

We find that every written memorandum in Michigan Mutual's possession prior to trial stated or clearly arrived at the inevitable conclusion that Frost was engaged in his own business when the accident occurred. Many of these memorandums were received in evidence. As late as September 7, 1960 (Pl Exh 26), Mr. Van Sluyters, an attorney acting as legal supervisor in the employ of Michigan Mutual wrote to the Branch Claims Manager:

"The writer's opinion on this matter is that *this is actually our case and not that of Allied* . . . Our insured has his own business and also drives on occasions for Allied . . . Frost at that time was driving his own unit, that is the tractor, and he was bobtailing; he was on no business of Allied, and as far as I can see the only connection with Allied is that they told him that it was okay to go home for the few days in between trips."

Even though defendant's legal supervisor arrived at this conclusion from facts developed by its investigation, defendant consistently refused to accept the views of its own attorneys and the facts developed from its own insured. We find this continued refusal on defendant's part a lack of good faith. Again, a later memorandum of March 15, 1961 (P Exh 32) from its legal supervisor points out that:

"Particularly, you will note Attorney Veum's opinion that definitely Frost *was not* on business of the Allied Van Lines at the time this accident occurred."

The defendant may not say that it did not know that the critical issue determining coverage between it and the plaintiff was the question of whose business Frost was engaged in when his accident occurred. Exhibit 32 continues:

"We also have a copy of the certificate of insurance for Allied Van Lines. It is especially noted in paragraph 4 of Pertinent Provisions, providing

---

4. See statement of Frost taken by defendant, December 18, 1959. The emphasis added (in (3) above) is taken directly from the statement. These reasons are totally personal to Frost and did not have any connection with Allied's business. Moreover, word to Frost of this appointment had to be relayed to him by his wife meaning that Frost called her and the dispatcher.

that as far as the agent of Allied Van Lines is concerned the coverage afforded by the policy applies *only* when the agent [Frost] is engaging in the business of Allied Van Lines, Inc."

Mr. Veum, a long time practicing attorney in the negligence field, was employed by Michigan Mutual to defend Frost. As late as February 10, 1961 (P Exh 30), he conveyed the same view to defendant's claims manager but defendant continued to reject his opinion. He said:

"Therefore, the whole question in this case in reference to coverage, as I see it, is whether William Dolan Frost at the time of the accident was on business or engaged in the business of any of those companies [Allied]. However, you will note that from the several statements made by Mr. Frost, they have really nailed him to the cross that when he left Sault Ste. Marie, Michigan, on Monday morning, December 7, 1959, he had a business appointment with Procurement Officer Woodbridge . . . This business appointment was for the sole benefit of the Frost Moving and Storage Company on a contract of storage for Bachelor Officers' Quarters furnishings."

Mr. Veum continued in this exhibit to give the defendant a fair appraisal of the Ketola lawsuit. He said:

"This case from a damage standpoint is dangerous as the plaintiff's decedent was a man 56 years of age with a life expectancy of 17 years, who made an annual income of $5,811.20 and he left nine dependants, his wife Pauline 49 years of age and the children ranging from the age of 5 to 17 years."

By a memorandum, dated September 20, 1962 (P Exh 56), Mr. Veum confirms the view we find defendant should have maintained if it were acting in good faith. He said:

"I think we were all under the original position that our policy extended coverage to the defendants Frost and Allied on the theory that Frost at the time of the accident was engaged in a personal mission and was not on the business of Allied Van Lines."

The Ketola action was started on July 21, 1960. In August 1960, the plaintiff tendered the defense of both Allied and Frost to the defendant. Notwithstanding the fact that every writing in its file concluded that Frost was on his own business, the defendant declined to accept the defense of both of its insureds.

On or about October 1961, the defendant decided to enter an answer in defense of Frost. It decided to continue its refusal to undertake the defense of Allied. We find from the testimony and exhibits that defendant's refusal to defend Allied exemplifies its bad faith. If the defendant sincerely believed that Frost was engaged in the business of Allied; or, if, as the defendant now argues, it in good faith believed Frost was engaged in the business of Allied, even though he was on a personal mission at the same time, the defendant should never have defended Frost at all. It would not have had to defend either under its insurance contract if Frost were engaged in the business of Allied. If he were not engaged in the business of Allied, as we think the defendant well knew, the defendant had the obligation to defend both Frost and Allied.

■■ We find that defendant's denial of coverage to its insured, Allied, was arbitrary, wrongful and without justification.

"An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract . . . The insurer should not be permitted to profit by its own wrong." Comunale v. Traders & General Insurance Co., 50 Cal.2d 654, 328 P.2d 198; 68 A.L.R.2d 883. (See also Traders & General Insurance Co. v.

Rudco Oil & Gas Co., 129 F.2d 621 (10 Cir.))

Where it is the insurer's duty to defend and the insurer wrongfully refuses to do so on the ground that there is no coverage, the insurer is guilty of breach of contract rendering it liable for all damages proximately caused by the breach. If the insurer refuses, in bad faith, to defend and/or to settle within its limits, the insurer may be held liable for the full amount of a judgment though in excess of its limits. Comunale v. Traders & General Insurance Co., supra; Landie v. Century Indemnity Co., Mo.App., 390 S.W.2d 558; Insurer's Liability To Insured for Judgments Exceeding Policy Limits, 7 Drake Law Review 23; 45 C.J.S. Insurance § 936; 40 A.L.R.2d 168.

The defendant directed the court's attention to the Ketola complaint which contained allegations that Frost was an agent of Allied and was in the scope of his agency when the accident occurred. Defendant then reasons that because of these allegations both plaintiff and defendant had the duty to defend. The defendant's theory being that it was not bad faith to refuse to defend Allied because the duty to defend is a separate covenant from the covenant to pay claims, with the former being controlled by the complaint. Generally, this is true. American States Insurance Co. v. Stachowski, 249 F.Supp. 189 (1955); Mohr & Sons v. Hanover Ins. Co., 322 F. Supp. 184 (1971); Shaw v. Aetna Cas. & Sur. Co., 407 F.2d 813, 814 (7th Cir. 1969); Aetna Casualty & Surety Co. v. State Farm Mutual Automobile Insurance Co., 16 Mich.App. 658, 168 N.W.2d 465 (1969). But, this general rule is not without exception as defendant would have us believe.

"It is a general rule that the duty of the insurer to defend an action against an insured is to be determined from the allegations of the complaint, Lee v. Aetna Casualty & Surety Co., 2 Cir., 178 F.2d 750; Annotation 51 A.L.R.2d 461, *unless the insurer knows that the true, but unpleaded, factual basis for the claims brings them within the coverage of the policy.*" Albuquerque Gravel Products Co. v. American Emp. Ins. Co., 282 F.2d 218, 220 (10 Cir.) (emphasis added).

This was recognized in American States Insurance Co. v. Stachowski, supra, wherein the court stated:

"An insurer's duty to defend an action against the insured is measured, *in the first instance* by the allegations in the plaintiff's pleadings . . . Since the insurer's duty to defend ordinarily is correlative with its duty to pay a judgment which might be obtained against the insured, *it is apparent that the insurer has the duty of defending only those actions that are within the terms of the policy . . . .*" 7A Appleman Insurance Law and Practice §§ 4683, 4684 (1961) (emphasis added). (See Hardware Mut. Casualty Co. v. Hilderbrandt, 119 F.2d 291 (10 Cir.); American Motorists Ins. Co. v. Southwestern Greyhound Lines, Inc., 283 F.2d 648 (10 Cir.).

In the event the allegations in the complaint did not disclose a basis for a defense, would an insurance company be able to avoid defending the insured if the true facts known to the insurance company required it to defend? Suppose further that an insurance company elects to ignore facts within its knowledge requiring it to defend, could it rely upon ill-founded allegations to justify a conclusion that it did not have a duty to defend? We think not. (See Hardware Mut. Casualty Co. v. Hilderbrandt, supra; American Motorists Ins. Co. v. Southwestern Greyhound Lines, Inc., supra.) To hold that there is no exception to the general rule would mean that an insurance company's contractual obligations could be controlled by the whims of the opposing party's pleading. The cases relied upon by the defendant are clearly distinguishable. The insurance contracts involved in those cases were totally unlike the contracts in this case. Here, if Frost were not engaged in the business of Allied, defendant's insurance con-

tract imposed upon it the duty to defend both Allied and Frost. The defendant cannot escape this contractual obligation by ignoring the true facts in reliance upon an ill-founded complaint.

 We are satisfied that before, during, and after the Ketola suit, Michigan Mutual knew Frost was not engaged in Allied's business. Nevertheless, Michigan Mutual through the attorney it engaged to defend Frost, admitted as true, the very allegations in the Ketola complaint, which it now relies upon, to cast the duty to defend Allied upon Transport. The attorney for Allied denied these allegations. At the time these admissions were made all the information in the defendant's file would have required defendant to deny these allegations. The admission of these allegations made defendant's position untenable because if the allegations were in fact true, the mere admission of these allegations meant defendant would not have had to defend Frost at all. Defendant's insurance contract would not, under its own admission, afford coverage to Frost. If the allegations were in fact true, the duty to defend Frost and Allied fell upon plaintiff and defendant knew this. The defendant further knew this placed its insured, Allied, in a perilous posture. It is no answer to say that the attorney it retained owed his entire allegiance to Frost. No matter how vigorous his representation, an attorney does not owe his client the duty to admit allegations that he knows are contrary to known facts. He is an officer of the court and may not use the court to cast liability or the duty to defend upon another. He may not frustrate the court's obligation to treat all parties before it equally. Defendant may not avoid responsibility for the acts of Frost's attorney. Defendant engaged him, paid him, had control over him, and required him to submit reports and opinions to it. We find, as a matter of law, that an insurance company that stands idly by when this occurs stands in bad faith with the opposite party and with a court

that is constitutionally bound to seek the truth.

We do not cite additional exhibits to support the finding that Michigan Mutual knew, prior to the Ketola suit, that Frost was engaged in his own business when his accident occurred because defendant's brief admits this. However, defendant argues it, in good faith, believed that Frost was also engaged in Allied's business at the same time. We find this theory totally unsupported in this record. This concept of "dual employment" is unsupported by defendant's voluminous files. This theory was raised for the first time at this trial. Defendant knew Frost was in business for himself, d/b/a Frost Moving and Storage Company. Defendant insured him for a premium. Defendant knew that when Frost's equipment was not used by Allied, he used it in his own business. Frost was not required to perform for Allied until December 8th, the day after the accident. This theory is contrary to the statements given by Frost and Forgrave to defendant's investigators. Defendant knew that it was not the business of Allied that sent Frost forth from Minneapolis to Sault Ste. Marie. He had three reasons for going, most important of which was his personal business appointment. When he decided to return home, he left his trailer in Minneapolis. He would have had to make the return trip to pick up the trailer even if he later decided against delivering the load.

To further establish it did not act in bad faith, defendant placed in evidence the agency contract and the lease agreement between Frost Moving and Storage Company and Allied Van Lines, Inc. The defendant's regional legal supervisor testified in support of the "dual employment" theory. He further testified that he relied upon the lease to support the position that Frost was also engaged in the business of Allied. We cannot attach credibility to this testimony. The defendant's files do not contain a single memorandum supporting this position.

This official continued to request additional investigations after the facts were known. He obtained a copy of the lease on April 28, 1961, long after he was made aware of Moore v. Palmer. The lease provided that Frost was free to use his vehicles in his own business when he was not in Allied's service. With this position, the defendant knew that the condition controlling its insurance coverage as to Frost and Allied had to be resolved; namely, whose business was Frost engaged in. The defendant's file adversely resolved this issue long before this witness obtained the lease.

■ To further support this position, defendant argues that the Interstate Commerce Commission regulations required Allied to remove its sign from the tractor and to obtain a receipt from Frost showing the vehicle had been returned to Frost for his own use. Allied failed to do this so its name was on the tractor door when the accident occurred. These regulations will not assist defendant to escape liability under its policy. Assuming this position was asserted prior to the Ketola trial, and it was not, it would not have been convincing. Defendant would seek to avoid liability because one negligently or purposefully fails to comply with the Interstate Commerce Commission regulations. The name "Allied" on the door of the tractor could not be determinative of whose business Frost was engaged in. Defendant may not avoid its contractual obligations by what its insured (Frost and Allied) do or fail to do. Before the lease was obtained, the defendant's attorneys and adjusters had concluded that "actually this is our case not that of Allied." The defendant has persistently refused to accept the views of its attorneys. We find that the defendant knew, in the light of the language contained in the certificates of insurance, that the question was whether Frost was on Allied's business and that the lease did not answer this question. Defendant knew that there would be times when someone would file suit against Allied alleging Frost was on

Allied's business when he was not. This is why the insurance coverage was purchased. The defendant could not in good faith take the view that because of the lease Frost was always engaged in Allied's business. This position would place defendant in the position of accepting a premium for which it knew no liability could ever exist. The same result would occur if the "dual employment" theory were carried to the extreme.

■ During the course of the Ketola trial, plaintiff alleges that the case could have been settled for $42,000 and that defendant's continued refusal to offer the limits of its coverage, being $25,000, was bad faith. We need not dwell on this occasion for settlement even though we find that the Ketola litigation could have been settled during trial. There was a more serious display of bad faith when defendant refused an opportunity to settle the trial court's $75,000 judgment for $65,000. Plaintiff offered to pay two-thirds of this amount, which would have resulted in defendant paying less than its policy limits. Plaintiff's attorney called defendant's Assistant Vice President for Home Office Claims, and requested defendant pay one-third of the $65,000 amount and suggested it could possibly settle for less. The defendant refused. It is clear the defendant was not considering the interests of either of its insureds. At this point in time, Frost was exposed to liability over the limits of his policy. Defendant's insured, Allied, had been held liable after consistently asserting that defendant's files clearly reflected that Frost was not on its business when the accident occurred. The defendant's refusal to settle the judgment by paying less than its policy limits was wrongful, arbitrary and bad faith.

The defendant urges the court to view its decision to decline the offer to settle the judgment in the light of the facts then existing. Defendant argues that the trial judge in ruling on a Motion for Judgment N.O.V. held that whether Frost was acting in the scope of his em-

ployment was an issue of fact. The defendant states that it had a right to rely upon this opinion. The defendant's Assistant Vice President, indeed, testified that he relied heavily upon this opinion when declining the offer. Defendant's Assistant Vice President is an attorney and an expert in the insurance business. We find his testimony, that he relied upon the language of the trial judge, inherently unacceptable.

The defendant chooses to rely upon a statement that serves its purpose and at the same time avoid considering the precise holding of the trial court, a holding that was compelled by Moore v. Palmer, 350 Mich. 363, 86 N.W.2d 585. The Ketola trial judge specifically held:

"Under Moore v. Palmer, 350 Mich. 363 [86 N.W.2d 585] *the question of agency and scope of employment is not a question in the case.* It would be in the case if we were still operating under the common law, but the Owners Liability Statute *as indicated* has broadened the common law and *the owner is liable* if he consents to a person driving the vehicle *whether or not the person* . . . follows the scope of his employment . . . ." (Emphasis added.)

The defendant's own attorney advised it about the Moore v. Palmer case in March 1960. This was approximately four months before suit was started. Defendant must be charged with the knowledge that under the *Moore* decision liability was not dependent upon one's "scope of employment." Further, if defendant relied upon the entire opinion it would have accepted the offer to settle the judgment. This opinion put to rest the question of Frost's negligence and further found that Ketola was free of contributory negligence. The defendant would have known that the chances for reversal on these issues were extremely remote.

After considering this entire transaction, the language of the policies of insurance, language of the lease and the agency contract in their entirety, the

exhibits received in evidence after placed in chronological sequence, the actions of the parties, the depositions received in evidence, the testimony of the witnesses including the reasonableness of their testimony, the court finds:

I. That Frost and Allied were insureds of both plaintiff and defendant and coverage depended upon one issue; namely, was Frost engaged in the business of Allied when the accident occurred.

II. That plaintiff carried its burden on the issue of "bad faith" beyond the mere preponderance, to the clear and convincing, and the court finds:

A. Defendant's persistent refusal to defend its insured, Allied, in the light of the true facts disclosed by its file, was wrongful, arbitrary, and in bad faith.

B. Every writing in defendant's file prior to the Ketola trial indicated that Frost was on his own business and defendant's rejection of facts developed by its legal supervisors and adjusters was bad faith.

C. It was bad faith to permit the admission of allegations 4, 8, and 9 in the Ketola complaint which allege that Frost was an agent of Allied acting in the scope of his employment when the accident occurred when defendant knew this was contrary to the true facts known to its own personnel and to the attorney it employed to defend Frost.

D. Defendant's arbitrary rejection of an offer to settle the judgment for an amount less than its policy limits, which by then was placed in reserve, and its refusal to negotiate a settlement before and during the trial was bad faith.

F. The persistent refusal of Michigan Mutual to contribute any part of the judgment after it had been affirmed by the Michigan Supreme Court is evidence of bad faith.

The court further finds:

I. Plaintiff is entitled to recover its expenses for investigation and defense of Allied, except those incurred prior to the date defendant first rejected the tender of Allied's defense.

II. Plaintiff may recover the entire amount of the judgment it paid plus interest.

The plaintiff shall have ten days from the date of this order to present an order for judgment consistent with these findings.

It is so ordered.