RILEY v. ROACH.

1. MASTER AND SERVANT — AUTOMOBILES — PERSONAL INJURIES — NEGLIGENCE.

For negligent injuries caused by defendant's chauffeur, who was directed by his employer not to take the automobile out while he was away from home unless directed by his wife, but who disobeyed instructions and took the car out with several guests that were staying at the house, defendant was not liable, under a declaration charging that the chauffeur acted with the knowledge and consent of defendant.[1]

2. EVIDENCE—HEARSAY—RES GESTÆ—MASTER AND SERVANT.

Statements made by defendant's chauffeur, while he was disobeying defendant's instructions, and was not engaged in the business of his employer, were hearsay and inadmissible.

[1] It will be noted that the injury complained of occurred before the "motor vehicle law" (Act No. 318, Pub. Acts 1909) went into effect.—REPORTER.

Liability of owner of automobile for injuries caused thereby while being used by a servant or a third person for his business or pleasure, see notes in 9 L. R. A. (N. S.) 1033; 14 L. R. A. (N. S.) 216; 21 L. R. A. (N. S.) 93; 26 L. R. A. (N. S.) 382.

Error to Oceana; Sessions, J. Submitted November 15, 1911. (Docket No. 127.) Decided January 23, 1912.

Case by Luke Riley against William Roach for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*Cross, Vanderwerp, Foote & Ross* and *V. V. Barnes,* for appellant.

*Rufus F. Skeels, Fred J. Russell, C. O. Smedley,* and *F. E. Wetmore,* for appellee.

STONE, J. This is an action on the case to recover damages for an injury received by the plaintiff on July 28, 1909, by reason of an alleged collision of defendant's automobile with the plaintiff's buggy, in which he was riding on a highway.

The declaration consists of two counts. In the first count the plaintiff alleges as follows:

"And which automobile of said defendant was then and there under the care, direction, and supervision of a certain then servant, to wit, one Hall, a chauffeur, of the said defendant, who was then and there driving the same in and along the highways in said county and State by the *order, direction* and *knowledge* of said defendant, and in the *prosecution of his business aforesaid.*"

In the second count it is alleged:

"And which automobile of said defendant was then and there under the care, direction, and supervision of a certain then servant, to wit, one Hall, a chauffeur, of the said defendant, who was then and there driving the same along the highways in said county of Oceana *with the consent of said defendant.*"

Upon the trial the following undisputed facts were shown: The defendant was the owner of a valuable automobile, which he bought the season before the accident. The defendant was called by the plaintiff for cross-examination under the statute. After testifying that the

chauffeur, Hall, had been in his employ nine days when the accident occurred, the following was his testimony:

"*Q.* Did you engage Mr. Hall to do any work, other than to operate your automobile?

"*A.* No, sir; I did not. Operate and keep it clean, keep it in repair, you understand—the general work of a chauffeur. He came to me well recommended. I was in the Upper Peninsula of Michigan on July 28, 1909. I left Hart the night of Sunday, July 25, 1909. I know a Mrs. Blake who resides in Albion. I don't know her given name. She is in no way related to me or to my wife. She was not in Hart when I left for the Upper Peninsula. I understood that she was at my place while I was gone.

"*Q.* As a guest?

"*A.* Well, she was there, and my wife was away from home, Mrs. Roach and I was away from home, and she was gone when I got back, and I understand she came to visit Mrs. Nott.

"*Q.* Who is Mrs. Nott?

"*A.* Mrs. Nott is my brother-in-law's wife, Mr. Nott, who was an Albion lady before her marriage.

"*Q.* Where was she living at that time?

"*A.* She was living in the village of Hart.

"*Q.* Occupying your residence?

"*A.* Oh, no.

"*Q.* Did your wife accompany you on your trip to the Upper Peninsula?

"*A.* No, sir.

"*Q.* Did you leave anybody in charge of your house while you were gone? .

"*A.* We did.

"*Q.* Who?

"*A.* Miss Harriett Nott.

"*Q.* That is not the Mrs. Nott that you speak of?

"*A.* No, no. This is a 'Miss;' I didn't say 'Mrs.'

"*Q.* Who is Miss Harriett Nott?

"*A.* My wife's sister.

"*Q.* She was given general charge of the house, was she, while you were gone?

"*A.* She was; yes, sir.

"*Q.* When did your wife leave Hart?

"*A.* Some two or three weeks before.

"*Q.* That is before you left?

"*A.* Before I left; yes, sir. I can't just tell you the exact date, some two or three weeks.

"*Q.* I am not particular about that. But you were both gone?

"*A.* Yes, sir.

"*Q.* And you left your residence in charge of Miss Harriett Nott, and were there any guests at your house at the time you left?

"*A.* I think my wife's sister was visiting between Mr. B. C. Nott's and my wife's house, our home.

"*Q.* What is your wife's sister's name?

"*A.* Mrs. Royce.

"*Q.* Is that Mrs. Carrie Adelle, or Adellia, do you pronounce it, Royce?

"*A.* That is the lady.

"*Q.* Any other guests there?

"*A.* Not that I remember of. We had guests coming and going all the time; men coming to see me on business that I always entertained at my home.

"*Q.* Your wife's sister was not there in the same capacity as men who drop in to see you on business, and that you entertain, was she?

"*A.* No, sir. She was there spending her summer. She came to Hart to spend her summer vacation. She was spending it between our home and Mr. Nott's home.

"*Q.* I suppose you did the best you could to entertain her, didn't you?

"*A.* Why, we didn't—she entertained herself.

"*Q.* You furnished an automobile for her use, if she desired it, didn't you?

"*A.* No, sir.

"*Q.* Never?

"*A.* No, sir.

"*Q.* Up to the time you left, hadn't she ridden in your automobile?

"*A.* No, sir.

"*Q.* Why was that?

"*A.* Well, one reason was that we hadn't a chauffeur for some considerable time; hadn't had anybody to drive the car. I don't know how to drive a car myself, and the time she come to visit us, up to the time that Mr. Hall came, we hadn't had anybody to drive the car.

"*Q.* You made quick use of him when you got him, didn't you?

"*A.* Why, no. I didn't make particularly quick use of him.

"*Q.* What use did you make of that automobile after Mr. Leslie Hall came there?

"*A.* My instructions to Mr. Hall—

"*Q.* (Interrupting) I am not asking you about your instructions. Read the question.

"*A.* I think I had it out twice.

"*Q.* Who had it?

"*A.* Leslie Hall and I.

"*Q.* Now, your purpose in getting Leslie Hall there as chauffeur just before your departure was for the purpose of having somebody to operate that automobile for the benefit of anybody that might want to use it there at the house, didn't you?

"*A.* Oh, no; I beg your pardon.

"*Q.* Nothing of that sort?

"*A.* Nothing of that sort.

"*Q.* For what purpose then?

"*A.* Please state your question again.

"*Q.* The stenographer will read it. (Last question read.)

"*A.* No, sir. My purpose of employing Leslie Hall was for the purpose of operating my automobile at such times as myself and my wife might want it.

"*Q.* You mean by that, that you didn't expect he would take one of your guests in your automobile — your wife's sister?

"*A.* I meant by that I do not take my automobile out without myself or Mrs. Roach goes with it.

"*Q.* Has that always been true?

"*A.* Up to that time; yes, sir.

"*Q.* How has it been since that time?

"*Mr. Smedley:* I object to that as incompetent.

"*Mr. Wetmore:* And immaterial.

"*The Court:* I think you may answer.

"*A.* Practically the same.

"*Q.* What did you use your automobile for?

"*A.* I use my automobile for the pleasure of myself and wife and invited friends, when we take them to ride with us.

"*Q.* For any purpose connected with the factory?

"*A.* I have used my automobile when I wanted to for my own individual use, whether it was for the factory, or whether it was my personal use. If I was going—it became necessary for me to go to Shelby or Muskegon, the

automobile is my individual property; and if I chose to ride in the automobile, rather than to go in the train, I did as I thought best about the matter.

"*Q.* In whose charge did you leave this automobile when you left for the North?

"*A.* I left it in Leslie Hall's charge, if anybody's.

"*Q.* There isn't any question about it, is there, but what you left it in his charge.

"*A.* I left it in his charge to do certain things with it. His instructions were complete.

"*Q.* How soon did you return after July 28th?

"*A.* I got back to Hart some time after 5 o'clock on the following Thursday. That would be the day following the accident.

"*Q.* To what use did Mr. Hall put your automobile while you were away, other than taking the trip on the occasion that Mr. Riley was injured.

"*A.* I wired—I called up by telephone—to have Leslie Hall take my automobile and come to Ludington, and meet me at Ludington.

"*Q.* When did you do that?

"*A.* On the morning of the 29th. I was gone from home Monday, Tuesday, Wednesday, and almost all Thursday. I left Sunday night on the evening train for Chicago.

"*Q.* What was done with that automobile on Monday and Tuesday, or either of those days?

"*A.* To my best knowledge, there wasn't anything done with it.

"*Q.* You happen to know about the use on Wednesday because of this accident, do you?

"*A.* Yes, sir. I first learned of what had occurred after the Hart plant had shut down on Thursday; it was 8 or 9 or 10 o'clock, or possibly 11 o'clock. I got the word when I was driving between here and Pentwater with Mr. Daggett, who is one of our stockholders, associated with me in business and an officer of the company at the present time; he told me about it. He wasn't an officer in the company at that time.

"*Q.* How were you paying Mr. Leslie Hall?

"*A.* Paying him by the week.

"*Q.* Did you pay him for the week that this accident occurred?

"*A.* Yes, sir.

"*Q.* Continued him in your employ?

"*A.* Yes, sir.

"*Q.* He is now in your employ ?

"*A.* Yes, sir.

"*Q.* In the same capacity ?

"*A.* Yes, sir."

Examination by Mr. Smedley:

" Just before I employed Leslie Hall as my chauffeur, my machine was out of commission.

"*Q.* And what did you have to do in order to fix it so that it would run ?

"*A.* Well, now, I am not very familiar with automobile terms; I don't run a car myself, because I am too busy a man. There was two little bearings in the hind axle, or in the hind mechanism, that we needed to get before we could run the car, because the bearings in that were worn out, or become deficient. I ordered those bearings, and they came, but they were the wrong size. I ordered them again, and they came, and they were the wrong size again, and I ordered them again, and they were the wrong size, and then I gathered up the old bearings and sent them down to Chicopee Falls, Mass., and got the right bearings. The correspondence in my office will show that it was their fault and not mine.

"*Q.* Was this after you employed Mr. Hall?

"*A.* This was previous to my employing Mr. Hall.

"*Q.* What, if any, work did he do in the machine ?

"*A.* He put those bearings in, and went over the car in a general way; went over it all through, took the rear axle down—I am not familiar with automobile terms.

"*Q.* After he got it fixed, did you use it before you went to the Upper Peninsula ?

"*A.* I did, I think, twice; Leslie Hall was with me. Those trips were to test the machine and see if it was in running order. Before I went away, I gave him some instructions. My instructions to him were to go all over the car, be as careful as he could with it, see that the machinery was all in working order, scour up the brass, brush out the top, clean it all up in good shape, and not take it out until my return, unless Mrs. Roach or I called for it. Mrs. Roach at that time was ill over to Mr. White's cottage on the beach, under a doctor's care. I think that beach is called Oceana Beach. It is eight miles from Hart by road. Mrs. Roach had been there probably three weeks before I employed Mr. Hall. She was still

out there in the cottage when I got back. She was very nervous, and I think the doctor called it nervous prostration.

"*Q.* Did she use the automobile during that time that you were away?

"*A.* Oh, no; the automobile was out of commission.

"*Q.* It was in commission before you went away?

"*A.* In commission before I went away; yes, sir.

"*Q.* While you were gone to the Upper Peninsula, did your wife use that?

"*A.* No, sir.

"*Q.* Who was staying with her out there to the beach?

"*A.* Mrs. Daggett at that time, and a girl.

"*Q.* Were those two women alone?

"*A.* With the exception of one young girl.

"*Q.* Who, if anybody, went out there nights to stay?

"*A.* Well, during her sojourn there, I either went out, or Mr. Daggett, or sometimes my brother-in-law, Mr. Nott, went out, if I had to be away from home.

"*Q.* How did they go and come.

"*A.* Sometimes we took Mr. Daggett's car; sometimes we drove with a horse.

"*Q.* And when you went to the Upper Peninsula at this particular time, who went out there nights to stay?

"*A.* Well, either Mr. Daggett or Mr. Nott was to go out there; they promised me faithfully when I went away that one of them would go every night, and I think it was Mr. Daggett went.

"*Q.* Do you know who was out there Tuesday night?

"*A.* No, sir.

"*Q.* Do you know what business this man Hall was on at the time he took out your car?

"*A.* Yes, sir.

"*Q.* Did you or your wife give him any orders to take that machine out?

"*A.* We did not.

"*Q.* When he took it out, was it without your knowledge and without your consent?

"*A.* It was.

"*Q.* And contrary to your instructions?

"*A.* Yes, sir.

"*Q.* How long had he been in your employ when you gave him these instructions not to take the car out—clean it up, but not to take it out until you got back, unless your wife instructed him to?

"*A.* Well, he came Monday on the train, and I think we got there—well, I can't say just when it did get here; it got here some time in the forenoon, and that was the following Saturday night.

"*Q.* And he had worked for you only five days?

"*A.* That is the time; yes, sir.

"*Q.* Now, why was it that you told him to clean it up, but not to take the car out until you got back unless your wife told him to?

"*A.* Well, sir, from the fact that I had just gotten the young man, and from the fact that the car had been needing some repairs, and from the fact that it was good business, as any other good business man would do.

"*Q.* How expensive a machine was that?

"*A.* Thirty-five hundred dollars, besides about $300 of extra repairs, fixtures, extra fixtures that always go to the car—appurtenances that goes onto the car.

"*Q.* What was the total cost of the machine to you?

"*A.* About $3,800. The car was a first-class equipped car."

Recross-examination by Mr. Cross:

"*Q.* Your wife was stopping where, you say, at this time?

"*A.* She was living over to Mr. White's cottage on the beach.

"*Q.* How far from Hart?

"*A.* Why, it is eight miles; it is considered eight miles to Pentwater, and I guess, perhaps, it is a half or three-quarters of a mile over to the cottages. I couldn't say just exactly; possibly more, possibly not so much.

"*Q.* Telephone communication between that cottage and your home?

"*A.* No, sir; no telephone."

Pursuant to the promise which had been made to defendant, Mr. Daggett, on the evening of July 27, 1909, in company with defendant's sister-in-law, Miss Nott, who had charge of the Roach house, and one Carl Flood, went in Mr. Daggett's automobile to the cottage at Oceana Beach, occupied by Mrs. Roach and Mrs. Daggett. While making the return trip to Hart, the following morning, their supply of gasoline became exhausted, and left them stranded or "stalled" 3½ miles north of Hart.

Mr. Flood and Miss Nott were with Mr. Daggett. Mr.
Flood was not a witness. As to what was done at this
point appears by the testimony of Mr. Daggett, as follows:

"*Q.* Now, when you exhausted your supply of gasoline,
what did you do to replenish it?

"*A.* Why, we were right by Mr. Cox's barn, and Mr.
Flood was with me, and I says, ' Well?' He says, 'We
will see whether Mr. Cox has any or not.' We met Mr.
Cox at the barn; asked him if he had any gasoline. He
said: 'No; but Mike might have some at the Corner.'
And Mr. Flood said: 'Well, we can get gasoline from
Hart about as quick as we could get it from the Corner,
a little over a half a mile away.' 'Well,' I says, 'all
right, then; you go and call Dikeman and have him bring
us out some.'

"*Q.* Where was Miss Nott during this time?

"*A.* She was way back in the road, in the car.

"*Q.* Who is Dikeman?

"*A.* Why, he is the man that does repairing here; he
repaired my car several times.

"*Q.* Who telephoned in?

"*A.* Mr. Flood.

"*Q.* Do you know to whom he telephoned?

"*A.* I don't, sir; I was not in the house.

"*Q.* Who came with the gasoline?

"*A.* Why, Mr. Hall, Mr. Roach's chauffeur.

"*Q.* Whose automobile did he have?

"*A.* Mr. Roach's automobile.

"*Q.* And who accompanied him on this trip out?

"*A.* The two ladies and a gentleman, Mrs. Royce, and
the other two parties I had never seen before.

"*Q.* There was Mr. Hall and Mrs. Royce?

"*A.* Mrs. Royce and the other two parties I had never
seen before.

"*Q.* Mrs. Royce is a sister of Mrs. Roach?

"*A.* Mrs. Roach's sister; yes.

"*Q.* Was visiting there at the time?

"*A.* Yes.

"*Q.* And there was another lady and gentleman?

"*A.* Yes.

"*Q.* That you were not acquainted with?

"*A.* Not acquainted with at the time.

"*Q.* Did you make their acquaintance, so that you can
tell us who they were?

"*A.* Yes; I was introduced to them.
"*Q.* Who were they ?
"*A.* Mrs. Blake and her son.
"*Q.* Do you know where they were visiting in Hart ?
"*A.* No; I don't."

Mr. Blake, whose deposition was taken, testified that he and his mother, in company with Mrs. Royce, with Hall as chauffeur, in response to a telephone message, left Hart with defendant's automobile to take a can of gasoline to Mr. Daggett. The gasoline was furnished in this manner, and after replenishing his car Mr. Daggett, with Miss Nott and Mr. Flood, proceeded on their way to Hart. The chauffeur continued on in the opposite direction until he found a suitable place in which to turn around, which he did, and it was while returning to Hart that the collision occurred which is the subject-matter of this suit.

At the conclusion of plaintiff's evidence, the trial court directed a verdict for the defendant, on the ground that the plaintiff had not made a case. In other words, the court held that at the time of the accident the chauffeur was not acting within the scope of his employment by defendant, but contrary to his directions, and was in fact performing a service for Mr. Daggett, and that the evidence did not warrant a submission of the case to the jury.

Verdict and judgment were entered for the defendant, and, after a motion for a new trial was denied, the plaintiff brought the case here upon writ of error, assigning as error that the trial court erred in directing a verdict for the defendant, and in refusing a new trial.

It is urged by appellant that it was not for the court to say, under all the evidence, that defendant's chauffeur was not acting within the scope of his employment; and that the presumption arising from the attendant facts and circumstances was not so completely overcome by the testimony of the defendant as to warrant the court in determining this question.

The appellant relies largely upon the case of *Moon* v.

*Matthews,* 227 Pa. 488 (76 Atl. 219, 29 L. R. A. [N. S.] 856, 136 Am. St. Rep. 902). Counsel quote at length from this case, and claim that it is in its facts almost identical with the instant case. The headnote of that case is to the effect that the mere fact that a chauffeur, in taking out his master's automobile in obedience to a command of the master's family, for the entertainment of friends and guests of the family, disobeys the master's command not to take out the car, unless the master accompanies it, does not show that he is acting outside the scope of his employment, so as to relieve the master from liability for injury done by the negligent handling of the car.

That case also holds that the facts and circumstances at the time of an accident may raise a presumption that the regular chauffeur employed by the owner, and in charge, was acting within the scope of his employment. In that case it appeared that the owner had forbidden the chauffeur to take out the car, unless he (the owner) was with it, and that upon the night of the accident the car was taken out by the chauffeur, under the direction of the sister of the owner and defendant, who made her home with the defendant, and was regarded as a member of the family.

We think that case is readily distinguished from the instant case. Here, when the chauffeur, Hall, took the automobile out on the trip when the accident occurred, he had no orders to do so from defendant, defendant's wife, or Miss Nott, who had been left in general charge of the house. No member of the family had given any orders to take it out. It was taken out without defendant's knowledge or consent, either express or implied, and was contrary to his express instructions. From this record, we think that it appears uncontradicted that the chauffeur acted in direct violation of his instructions, and outside the scope of his employment. He was acting either upon his own motion, or was obeying the instructions of Mr. Flood, Mr. Daggett, or some one else, who had no authority to bind the defendant.

168 MICH.—20.

Counsel for appellant also cite and quote from *Steffen* v. *McNaughton,* 142 Wis. 49 (124 N. W. 1016, 26 L. R. A. [N. S.] 382). In that case it was held that a chauffeur, employed by the owner of an automobile to care for the machine and operate it at the request and direction of the owner, or any member of his family, and who is to go to his home for his midday meal, is *not,* when using the automobile to go to such meal, without the permission or knowledge of the owner, acting within the scope of his employment, so as to render the owner liable for his negligent act in injuring a pedestrian with the machine. Counsel quote the following language from the opinion:

"The law governing the liability of a master for the acts of the servant in this class of cases is embodied in the following comprehensive statement:

"'For all acts done by a servant in obedience to the express orders or direction of the master, or in the execution of the master's business, within the scope of his employment, and for acts in any sense warranted by the express or implied authority conferred upon him, considering the nature of the services required, the instructions given, and the circumstances under which the act is done, the master is responsible.' *Ritchie* v. *Waller,* 63 Conn. 160 [28 Atl. 29], 27 L. R. A. 161 [38 Am. St. Rep. 361].

"While the rule of such liability may readily be comprehended, its application to the varying facts in cases of this class is often attended with difficulty. The ultimate inquiry usually resolves itself into one of fact, under the particular evidential facts and circumstances of the case."

We have examined with care the authorities cited by appellant's counsel, but are unable to agree with counsel as to their applicability. In order to render the cited cases applicable, counsel are forced to the position that the testimony shows conclusively that the chauffeur, Hall, on the day and at the time of the accident, was using the machine for the benefit of Mrs. Roach, as well as for the defendant, and that the machine was used for the guests of the family and those in charge of the household.

We think that this position is not warranted by the un-

disputed evidence in the case. We have already quoted from and called attention to the evidence, which shows conclusively, in so far as this record is concerned, that the chauffeur was not acting by authority of defendant, his wife, Miss Nott, or any member of the family, but against the positive and explicit instructions of the defendant. If it can be said that there is any presumption in such a case that the chauffeur was acting within the scope of his general employment, we think that in this case that presumption is completely overthrown by the uncontradicted evidence in the case. Upon the facts, it cannot be said that there is any conflict in the case. For that reason, the numerous Michigan cases cited by appellant's counsel are not in point.

In the recent case of *Hartley* v. *Miller*, 165 Mich. 115 (130 N. W. 336, 33 L. R. A. [N. S.] 81), we discussed somewhat at length the rules of law applicable in cases of this kind, in this State, prior to the going into effect of Act No. 318 of the Public Acts of 1909. We there said that the doctrine of *respondeat superior* applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong at the time, and in respect to the very transaction out of which the injury arose; and that the cases are controlled by the general rules of law governing the relation of master and servant, or principal and agent.

In addition to the authorities cited in *Hartley* v. *Miller*, *supra*, we call attention to the discussion of this subject in Berry on Law of Automobiles, §§ 135 to 145, and the many cases there cited; Huddy on Automobiles (2d Ed.), pp. 245 to 251, and cases cited.

The test of the liability of the master for his servant's acts is whether the latter was at the time acting within the scope of his employment. The phrase "in the course or scope of his employment or authority," when used relative to the acts of a servant, means while engaged in the service of his master, or while about his master's business.

It is not synonymous with "during the period covered by his employment." We are of opinion that the trial judge did not err in directing a verdict for the defendant.

Error is also assigned because the court excluded evidence of the statements of the chauffeur, made on the occasion of the accident. The statements not being made by the chauffeur while engaged in the business of the defendant, but while he was violating the defendant's express orders, he could not bind defendant by any of his acts or statements, and it was no part of the *res gestæ*. *Patterson* v. *Railway Co.*, 54 Mich. 91 (19 N. W. 761); *Hall* v. *Murdock*, 119 Mich. 389 (78 N. W. 329).

We find no error in the record, and the judgment of the circuit court is affirmed.

McAlvay, Blair, Ostrander, and Bird, JJ., concurred.