**BUDGET RENT–A–CAR SYSTEM, INC.**

v.

**Nicole CHAPPELL and Joseph Powell, III**

**No. CIV.A. 02–8975.**

United States District Court, E.D. Pennsylvania.

Feb. 2, 2004.

Stephen A. Scheuerle, Horn & Scheuerle, Philadelphia, PA, for Plaintiff.

Roger L. Simon, Friedman & Simon, Jericho, NY, for Defendants.

## MEMORANDUM

DALZELL, District Judge.

Joseph Powell, III rented a car from Budget Rent–A–Car Systems, Inc. in Michigan and drove it to New York, where he picked up Nicole Chappell. While Powell was driving through Pennsylvania with Chappell, the car was involved in an accident, and Chappell suffered serious injuries. Budget brought this action for a declaratory judgment on the extent of its vicarious liability for Powell's negligence. The parties' cross-motions for summary judgment, which raise vexing and consequential choice of law problems, are now before us.[1]

---

1. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. *Matsushita Elec. Indus.* *Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The task for the Court is to inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at

*Factual Background*

While visiting North Carolina in August of 2001, twenty-six year old Nicole Chappell of New York met Joseph Powell, III, a Michigan resident who had nearly reached his twenty-first birthday. Simon Decl. Ex. A ("Stip.") ¶ 1, Ex. B ("Chappell Decl.") ¶¶ 2–3. Even after returning to their homes, Chappell and Powell maintained a friendship through weekly telephone conversations and occasional reunions. *Id.* ¶ 3. As Valentine's Day, 2002, approached, Powell planned to surprise Chappell by driving from Michigan to New York to deliver roses and a bracelet. Simon Decl. Ex. D. ("Powell Dep.") at 10. Thus, in late January of 2002, he began his preparations by arranging for a one week rental of a Ford Explorer from Budget Rent–A–Car Systems, Inc. ("Budget Systems")[2] in Warren, Michigan. Stip. ¶ 11.

For reasons that will become apparent later, we now consider at length minutiae that in any other context would be far too arcane to warrant mention.

On January 30, 2002, Nissan North America, Inc. transferred a 2002 Nissan Xterra with Vehicle Identification Number 5N1ED28Y02C532670 (the "Xterra") to a Nissan dealership in Florida, and the dealership promptly transferred that vehicle to Budget Systems in Michigan. Simon Decl. Ex. J. Assuming that Budget Systems followed its regular procedures, after the Xterra arrived in Romulus, Michigan, a Budget Systems fleet clerk obtained Michigan license plate NVQ532 and placed that plate on one of the Xterra's seats. Simon Decl. Ex. F ("Schenk Dep.") at 3, 5–19; Stip. ¶ 12.[3] A "lot person" later removed the plate from the Xterra's seat and affixed it to the vehicle.[4] Schenk Dep. at 14, 19. After placing the plate in the Xterra, the fleet clerk wrote license plate number "NVQ532" at the top of the vehicle's certificate of origin and took the certificate to the office of Michigan's Secretary of State. Schenk Dep. at 21–23; Simon Decl. Ex. J.[5] Someone unknown crossed out the fleet clerk's initial reference to "NVQ532" and wrote "PHS756" next to it. *See* Schenk Dep. at 37–38; Simon Decl. Ex. J.

An employee at the Secretary of State's office used the certificate of origin, including the handwritten annotation for the license plate, to register the Xterra and to create an Application for Michigan Vehicle Title for it. Schenk Dep. at 21–29. Be-

251–52, 106 S.Ct. 2505; *Tabas v. Tabas,* 47 F.3d 1280, 1287 (3d Cir.1995) (en banc).

**2.** Budget Systems was a Delaware corporation that maintained its principal place of business in Illinois. It was also a subsidiary of Budget Group, Inc. ("Budget Group"). Stip. ¶ 4.

**3.** The fleet clerk would have obtained the plate from a "lot inventory" of plates that had been affixed to other vehicles that were taken out of service. Schenk Dep. at 19. Michigan license plate NVQ532 was registered for use with a 2001 Ford with Vehicle Identification Number 1FAFP55201G235610 (the "Ford") that Team Fleet Financial Corporation ("Team Fleet") owned. Simon Decl. Ex. I. Team Fleet leased its vehicles to "affiliated" companies. *See* Def.'s Mot. to File Surreply Br. Ex. C. We infer that Team Fleet leased its vehicles to Budget Systems because both Bud-

get Systems and Team Fleet were wholly owned subsidiaries of Budget Group. *See* Def.'s Mot. to File Surreply Br. Ex D. Attach. I. Because of the corporations' close affiliation, we are not surprised that Budget Systems's fleet clerk would have had access to a plate registered to a vehicle that Team Fleet owned.

**4.** The lot person must have affixed the plate before February 12, 2002 because the Xterra bore that plate on that day. *See* Stip. ¶ 12.

**5.** The Xterra was registered and the title application was filed on February 13, 2003, *see* Simon Decl. Exs. E, K; Schenk Dep. at 34, so we can be sure only that the fleet clerk submitted the certificate of origin sometime on or before that date.

cause someone had written "PHS756" on the certificate of origin, the Secretary of State's office registered the Xterra with Michigan license plate PHS756 and prepared a title application for the transfer of Michigan license plate PHS756 to the Xterra. *See* Simon Decl. Exs. E, K; Schenk Dep. at 39–40.

After the lot person affixed Michigan license plate NVQ532 to the Xterra, but before the Secretary of State had registered the vehicle, Budget Systems transported it about thirty miles from Romulus, Michigan to Warren, Michigan.

The morning of February 12, 2002, Powell arrived at Budget Systems's Warren, Michigan location to pick up the Ford Explorer that he had reserved a few weeks before. Because there were no Ford Explorers available at that time, a Budget Systems rental agent suggested that Powell take the Xterra instead. Stip. ¶ 13. Powell agreed to the substitution, signed a Rental Agreement,[6] and drove away with the Xterra. Stip. ¶ 12. As Powell drove away from Budget Systems's Warren, Michigan location, the Xterra bore Michigan license plate NVQ532, *id.*, and was not yet registered.

After a short rest, Powell drove the Xterra for eight consecutive hours and reached Chappell's home around 11:00 p.m. on Tuesday, February 12, 2002. Simon Decl. Ex. D ("Powell Dep.") at 16; Chappell Decl. ¶ 5. Powell remained in New York for the rest of the week while Chappell worked. On the evening of Friday, February 15, after Chappell completed her work week, she and Powell left New York in the Xterra. They planned to spend the weekend together in Michigan. Chappell Decl. ¶¶ 5–6.

While driving through Pennsylvania early the next morning, Powell fell asleep at the wheel of the Xterra. The car drifted from the left lane of Interstate 80, across the right lane, and into the right guardrail, causing it to roll over. Simon Decl. Ex. H ("Accident Report") at 8. Powell escaped the crash largely unscathed, but the force of impact ejected Chappell from the Xterra. *Id.* at 4. A helicopter transported her from the scene of the accident to Mercy Hospital in Pittsburgh, where doctors diagnosed, among other injuries, a broken femur, broken ribs, and spinal injuries. Simon Decl. Ex. P ("Carfi Decl."). These injuries have rendered Chappell permanently paraplegic. *Id.*

Budget Systems initiated this action for a declaratory judgment against Powell and Chappell and asks us to determine which state's law governs the extent of its vicarious liability for Powell's negligence. Compl. at 4. Chappell brought two counterclaims against Budget Systems[7] and a cross-claim against Powell.

Even before this suit began, Budget Group and several of its subsidiaries, including Budget Systems, had filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Stip. ¶ 5. With Budget Group unable to reorganize itself successfully, United States Bankruptcy Judge Mary F. Walrath approved an agreement in which, among other things, Cherokee Acquisition Corpo-

---

6. The Rental Agreement governed the terms according to which Budget Systems rented a Nissan Xterra with Michigan license plate NVQ532 to Powell. Simon Decl. Ex. C ("Rental Agreement"). Among its many provisions, the Rental Agreement explained that Budget Systems would "provide[ ] protection for bodily injury (including death) and property damage resulting from use or operation of the vehicle, limited as follows: Budget [Systems's] protection will not exceed the minimum financial responsibility limits ... required by applicable law." *Id.* ¶ 5.

7. Chappell's first counterclaim is based on Section 388 of New York's Vehicle and Traffic Law, and her second counterclaim states a negligent entrustment theory.

ration ("Cherokee") assumed Budget Systems's liability in this case. Simon Decl. Ex. M §§ 2.2(ii), 2.5(a)(iv). Soon after the transfer, Cherokee changed its name to Budget Rent–A–Car System, Inc. ("Budget").[8] Stip. ¶ 8. We allowed this case to proceed with Budget as a substitute plaintiff for Budget Systems, and Budget and Chappell have filed cross-motions for summary judgment on Budget's claim for a declaratory judgment.

*Analysis*

■ As noted, the parties seek a declaratory judgment as to whether the law of New York or Michigan governs the extent of Budget's vicarious liability to Chappell for Powell's negligence. Like any federal court faced with a choice of law issue, we apply the choice-of-law rules of the state in which we sit. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, Pennsylvania choice-of-law rules will determine whether New York or Michigan substantive law controls the disposition of the declaratory judgment action.

### A. *Choice of Law Framework*

■ In *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805, 416 Pa. 1, 21 (1964), the Pennsylvania Supreme Court abandoned the traditional *lex loci delicti* rule [9] "in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." Our Court of Appeals has explained that the *Griffith* "methodology combines the approaches of both Restatement II (contacts establishing significant relationships) and 'interest analysis' (qualitative appraisal of the relevant States' policies with respect to the contro-

versy)." *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978).

■ In applying *Griffith*'s "hybrid" approach, we begin with an "interest analysis" of the policies of all interested states and then—based on the results of that analysis—proceed to characterize the case as a true conflict, false conflict, or unprovided-for case. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 & n. 15 (3d Cir. 1991); *see also LeJeune v. Bliss–Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996). A true conflict exists "when the governmental interests of *both* jurisdictions would be impaired if their law were not applied." *Lacey*, 932 F.2d at 187 n. 15. On the other hand, there is a false conflict "if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Id.*, at 187. An unprovided-for case arises when neither jurisdiction's interests would be impaired if their law were not applied.

■■ When interest analysis identifies a false conflict or an unprovided-for case, resolving the choice-of-law issues becomes relatively straightforward. In false conflicts, the Court applies the law of the only interested jurisdiction. *See, e.g., Kuchinic v. McCrory*, 222 A.2d 897, 899–900, 422 Pa. 620, 623–24 (1966) (applying Pennsylvania law when Georgia was not a "concerned jurisdiction"); *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 807, 416 Pa. 1, 25 (1964) (applying Pennsylvania law when Pennsylvania had an interest in having its law applied but Colorado had no such interest). *Lex loci delicti*, however, continues to govern unprovided-for cases. *See, e.g., Miller v. Gay*, 323 Pa.Super. 466, 470

---

8. Cherokee was and Budget is a Delaware corporation that maintained its principal place of business in New Jersey. *See* Stip. ¶¶ 7–9.

9. According to the *lex loci delicti* rule, the law of the place of wrong governs the substantive rights of the parties in a personal injury action. *See Griffith*, 203 A.2d at 801, 416 Pa. at 11–12.

A.2d 1353, 1355–56 (1983) (applying Delaware law by default when automobile accident occurred in Delaware and neither Delaware nor Pennsylvania had interests in application of their law). True conflicts are much more complex.[10]

To resolve the choice-of-law questions raised here, we first determine the extent of Budget's vicarious liability for Chappell's negligence under the laws of each of the relevant states. Only then may we classify this case as a true conflict, false conflict, or unprovided-for case.

### B. *Sources of Law*

Chappell argues that New York law should control the resolution of this case. *See* Def.'s Mem. Supp. Mot. Summ. J. at 1. Budget, on the other hand, insists that Michigan law governs. *See* Pl.'s Mem. Supp. Mot. Summ. J. at 4. By advancing these positions, the parties agree that no other state's law should apply,[11] so we limit our analysis to the laws of New York and Michigan.

### 1. *New York*

At common law, the owner of an automobile who allowed another to drive it was not always vicariously liable for the driver's negligence. *See Selles v. Smith,* 4 N.Y.2d 412, 176 N.Y.S.2d 267, 151 N.E.2d 838, 840 (1958). Although the owner could be vicariously liable for the driver's negligence if the driver was her employee or she could be liable for her own negligent entrustment of the vehicle to an unsafe driver, ownership alone was not enough to establish vicarious liability. *See Gochee v. Wagner,* 257 N.Y. 344, 178 N.E. 553, 553 (1931). By depriving plaintiffs of a cause of action against an automobile's owner, the common law failed to compensate victims of judgment-proof drivers.

To mitigate the perceived shortcomings of the common law, New York's legislature enacted a new statute, which—in its current form—provides that "[e]very owner of a vehicle used or operated in this state shall be liable and responsible for . . . inju-

---

**10.** If a case presents a true conflict, then Pennsylvania choice-of-law rules "call for the application of the law of the state having the most significant contacts or relationships with the particular issue." *In re Estate of Agostini,* 311 Pa.Super. 233, 457 A.2d 861, 871 (1983). To identify the jurisdiction with the most significant relationship, courts apply Section 145 of the Second Restatement of Conflict of Laws. *See Troxel v. A.I. duPont Inst. (Appeal of Browngoehl),* 431 Pa.Super. 464, 636 A.2d 1179, 1180 (1994) (describing the adoption of "the 'significant relationship' approach of Section 145").

According to Section 145, courts should consider four contacts when identifying the jurisdiction with the most significant relationship to the issues in the case: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the residence, place of incorporation, and place of business of the parties; and (d) the place where the parties' relationship is centered. Restatement (Second) of Conflict of Laws § 145 (1971). "The weight of a particular state's contacts must be mea-

sured on a qualitative rather than quantitative scale," *Cipolla v. Shaposka,* 267 A.2d 854, 856, 439 Pa. 563, 566 (1970), and the appropriate weight given to any particular contact depends on that contact's significance under the principles enumerated in Section 6. Such principles include (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6 (1971).

**11.** Had the parties not so agreed, we might have considered the applicability of the law of Pennsylvania, the state where the accident occurred; Delaware, the state where Budget Systems was incorporated; and/or Illinois, the state of Budget Systems's principal place of business.

ries to person ... resulting from negligence in the use or operation of such vehicle ...." N.Y. Veh. & Traf. Law § 388(1) (Consol.2003). The New York legislature passed Section 388 because it "intended that the injured party be afforded a financially responsible insured person against whom to recover for injuries." *Plath v. Justus*, 28 N.Y.2d 16, 319 N.Y.S.2d 433, 268 N.E.2d 117, 119 (1971).

Whether Section 388 applies here depends upon whether the Xterra was "a vehicle used or operated" in New York, within the meaning of the statute. At first glance, the Xterra seems to be such a vehicle because Powell did indeed operate it in New York. Still, we cannot ignore that an expansive interpretation—one which applied Section 388 to any vehicle that was *ever* operated in New York—could lead to absurd results.[12] Although New York's legislature could not have intended for Section 388 to apply whenever a vehicle has *ever* been driven in New York, that state's highest court has repeatedly held that the legislature did intend for Section 388 to apply in some situations where the accident occurred outside of New York.

In *Farber v. Smolack*, 20 N.Y.2d 198, 282 N.Y.S.2d 248, 229 N.E.2d 36 (1967), for example, Robert Smolack loaned his automobile to his brother, Arthur, so that he could drive his family to Florida and back. While in North Carolina, Arthur's negligent decision to continue driving at an unsafe speed while the car was "pulling" caused an accident in which his wife was killed and his two sons were injured. All of the parties were New York residents and the car was registered in New York. Representatives of the wife's estate and of the children sued Robert under Section 388, but the trial court dismissed the claim. When the case reached the New York Court of Appeals, it held:

> [W]hen a fatal accident occurs out of State and New York is ... the jurisdiction having "the most significant relationship" with the issue presented, [Section 388] determines the rights of the victim's survivors. To the extent that earlier decisions declined to give extraterritorial effect to the statute, they are overruled.

*Id.* at 40 (citations omitted). Subsequent decisions confirmed that Section 388 could apply to accidents that occurred outside of New York. *See, e.g., Sentry Ins. Co. v. Amsel*, 36 N.Y.2d 291, 367 N.Y.S.2d 480, 327 N.E.2d 635, 637 (1975) ("The legislative history of section 388 of the Vehicle and Traffic Law indicates that the Legislature intended to enlarge the vehicle own-

---

12. Imagine, for example, that Powell and Chappell were never involved in an accident and that they returned the Xterra safely to Budget. If Budget later rented the Xterra to another Michigan resident, who drove the vehicle only in Michigan and through whose negligent operation a Michigan resident was injured, then a broad interpretation of Section 388 would allow the injured Michigan resident to argue that the New York law imposed liability on Budget because the Xterra was a vehicle that was once operated in New York.

While it is not likely that any court would choose to apply New York law to those facts, this portion of our opinion does not focus on the choice-of-law issues. Rather, we pose the above hypothetical to illustrate the absurdity of interpreting Section 388's coverage too broadly. Only after we determine the proper interpretation of Section 388 may we use Pennsylvania choice-of-law rules to decide whether it is proper to apply that interpretation to the facts of this case.

Because we focus first on the issue of whether Section 388 covers these facts, we do not address the myriad cases that have considered the applicability of that statute based on choice-of-law principles. *Klaxon* requires that we use Pennsylvania choice-of-law rules to determine which law applies, so any case that employs some other methodology cannot guide our inquiry.

er's vicarious liability and not to draw the line at the border.").

Despite its holdings that Section 388 covered some extraterritorial accidents, the Court of Appeals has recognized that the law's reach is not unlimited. In *Fried v. Seippel,* 80 N.Y.2d 32, 587 N.Y.S.2d 247, 599 N.E.2d 651 (1992), Avis, which operated in New York, owned the Jamaican car rental company that rented a vehicle of Jamaican registry to Seippel, a New York resident. While Seippel was driving in Jamaica, he negligently caused a head-on collision by crossing the dividing line of a two-lane, two-way road. Fried, Seippel's passenger and also a New York resident, died in the accident. The representative of Fried's estate sued Avis under Section 388, and the trial court denied Avis's motion for summary judgment based on the Jamaican company's ownership of the vehicle. Putting aside the issue of whether Avis could be held vicariously liable when its affiliate actually owned the vehicle, the Court of Appeals held that "vicarious liability imposed by section 388(1) does not extend to owners of vehicles that have never been registered, used, operated or intended for use within this State." *Id.* at 654.

Read together, *Farber* and *Fried* explain that Section 388 applies extraterritorially in some situations, but within limits. These limits focus solely on the vehicle itself and not on other factors that may influence a choice-of-law analysis, such as the parties' residence.[13] *Fried* presents an example of a vehicle that was radically disconnected from New York; it was not registered in New York, and it had never been driven in New York. By contrast, *Farber* involved a car that was registered in New York and that became involved in an out-of-state accident during one of the brief periods when it was not operated in-state. The facts here fall in the middle ground between *Farber* and *Fried* because the Xterra was not registered in New York but Powell did drive it there.

◼ We have not found any cases that address the precise question presented here: whether Section 388 imposes vicarious liability on the owner of a vehicle involved in an accident outside of New York when the vehicle was not registered in New York but was briefly operated in New York before the accident.[14] Faced with the choice between two interpretations of its law—one finding that it covered a vehicle whose only connection with the state was its brief presence therein and another holding that the statute did not reach so far—we predict that the New York Court of Appeals would recognize that the United States Supreme Court has held that due process forbids states from regulating extraterritorial activities with which they have "slight" or "casual" connection. *See Hartford Accident & Indem. Co. v. Delta & Pine Land Co.,* 292 U.S. 143, 150, 54 S.Ct. 634, 78 L.Ed. 1178 (1934); *see also Home Ins. Co. v. Dick,* 281

---

**13.** It is not surprising that the Court of Appeals has not focused on the parties' residence when considering the situations in which Section 388 applies extraterritorially because the statute's text focuses on the "vehicle" and not on the parties.

**14.** Chappell cites *Cunningham v. McNair,* 48 A.D.2d 546, 370 N.Y.S.2d 577 (1st Dep't 1975), as authority for the applicability of Section 388, but *Cunningham* is not persuasive because it relies on New York choice-of-

law analysis rather than direct consideration of whether Section 388 applies extraterritorially. Moreover, *Cunningham* has been criticized as an incorrect statement of New York law. *See Fried v. Seippel,* 80 N.Y.2d 32, 587 N.Y.S.2d 247, 599 N.E.2d 651, 655 (1992); *Klippel v. U–Haul Co.,* 759 F.2d 1176, 1181 (4th Cir.1985); *see also* Peter E. Herzog, *Conflict of Laws,* 31 Syracuse L.Rev. 89, 104–05 (1980); Peter E. Herzog, *Conflict of Laws,* 27 Syracuse L.Rev. 17, 29–31 (1976).

U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930). To avoid the serious constitutional questions that interpreting Section 388 to cover the facts of this case would raise, the New York courts would conclude that the New York legislature did not intend for Section 388's reference to "vehicle[s] used or operated" in New York to cover vehicles that are registered outside of New York and that were not being used or operated in New York at the time of an accident. *See, e.g., Atkinson v. City of New York,* 96 N.Y.2d 809, 727 N.Y.S.2d 376, 751 N.E.2d 455, 456 (2001) (choosing "to interpret the [statute in question] to avoid ... constitutional concerns").

Because the Xterra was not registered in New York at the time that the Pennsylvania accident occurred, Section 388 would not impose vicarious liability on its owner. As there is no other basis for the imposition of such liability on Budget, we conclude that, under New York law, Budget is not vicariously liable to Chappell.

### 2. *Michigan*

As in New York, the common law of Michigan did not mechanically hold an automobile's owner vicariously liable for the driver's negligence. *See Hartley v. Miller,* 165 Mich. 115, 130 N.W. 336, 337 (1911). In certain cases—for example, when the driver operated the vehicle as an employee of the owner within the course of his employment—the owner could be liable for the driver's negligence, but liability depended on facts other than mere ownership. *See, e.g., Riley v. Roach,* 168 Mich. 294, 134 N.W. 14, 18–19 (1912) (refusing to hold vehicle's owner liable for negligence of his chauffeur when the chauffeur drove the vehicle against the owner's orders). The upshot of the common law rule was that "generally the driver of the commercial motor vehicle whose negligence caused the accident was financially irresponsible and the financially responsible owner es-

caped liability." *Kalinowski v. Odlewany,* 289 Mich. 684, 287 N.W. 344, 349 (1939).

"[T]o place the risk of damage or injury upon the person who has the ultimate control of the vehicle," *Roberts v. Posey,* 386 Mich. 656, 194 N.W.2d 310, 312 (1972), the Michigan legislature supplemented the common law with a new statute. As currently codified, that statute declares that:

> The owner of a motor vehicle is liable for an injury caused by the negligent operation of the motor vehicle whether the negligence consists of a violation of a statute of this state or the ordinary care standard required by common law. The owner is not liable unless the motor vehicle is being driven with his or her express or implied consent or knowledge.

Mich. Comp. Laws § 257.401(1) (2003) ("Subsection 1"). The Michigan Supreme Court has interpreted this language to impose vicarious liability on a vehicle's owner when the driver's negligence causes an accident in another state so long as the owner-driver relationship was centered in Michigan. *See Sexton v. Ryder Truck Rental, Inc.,* 413 Mich. 406, 320 N.W.2d 843 (1982).

In response to car rental companies' complaints that Subsection 1 was "inhibiting the growth of the industry and threatening to drive some companies out of the state," the Michigan legislature amended the law in June of 1995. *DeHart v. Joe Lunghamer Chevrolet, Inc.,* 239 Mich.App. 181, 607 N.W.2d 417, 420 (1999). A new subsection provides that:

> [A] person engaged in the business of leasing motor vehicles who is the lessor of a motor vehicle under a lease providing for the use of the motor vehicle by the lessee for a period of 30 days or less is liable for an injury caused by the negligent operation of the leased motor vehicle only if the injury occurred while

the leased motor vehicle was being operated by an authorized driver under the lease agreement .... Unless the lessor, or his or her agent, was negligent in the leasing of the motor vehicle, the lessor's liability under this subsection is limited to $20,000.00 because of bodily injury to or death of 1 person in any 1 accident and $40,000.00 because of bodily injury to or death of 2 or more persons in any 1 accident.

Mich. Comp. Laws § 257.401(3) (2003) ("Subsection 3"). Michigan's intermediate appellate court has held that Subsection 3's cap on rental car companies' vicarious liability is constitutional. *Phillips v. Mirac, Inc.*, 251 Mich.App. 586, 651 N.W.2d 437 (2002).

Budget insists that Subsection 3 limits its vicarious liability to Chappell to $20,000.00. *See* Pl.'s Mem. Supp. Mot. Summ. J. at 13. Chappell, however, argues that Budget may not receive the benefit of the cap because Budget is not a "lessor of a motor vehicle under a lease," within the meaning of Subsection 3. According to this argument, the Rental Agreement between Budget and Powell is not a legally valid "lease" because Budget allowed Powell to drive the Xterra even though it did not bear the license plate that the Secretary of State had assigned to it. *See* Def.'s Mem. Supp. Mot. Summ. J. at 11–19.

At the time of the accident, it was a misdemeanor for "an owner knowingly [to] permit to be operated, upon any highway, a vehicle required to be registered ... unless there is attached to and displayed on the vehicle ... a valid registration plate issued for the vehicle." Mich. Comp. Laws § 257.255(1), (2) (2001).[15] Whether Budget committed a misdemeanor by leasing

the Xterra to Powell while it bore license plate NVQ532 depends on two factors: (1) whether license plate NVQ532 was a valid registration plate issued for the Xterra; and (2) whether Budget acted with the requisite state of mind.

■ Budget concedes that it did not follow the regular procedures for registering the Xterra, *see* Mich. Comp. Laws § 257.217(1), but it maintains that it complied with an alternative procedure described as follows:

If a vehicle is delivered to a purchaser or lessee who has valid Michigan registration plates that are to be transferred to the vehicle, and an application for title, if required, and registration for the vehicle is not made before delivery of the vehicle to the purchaser or lessee, the registration plates shall be affixed to the vehicle immediately, and the dealer shall provide the purchaser or lessee with an instrument in writing, on a form prescribed by the secretary of state, which shall serve as a temporary registration for the vehicle for a period of 15 days from the date the vehicle is delivered.

Mich. Comp. Laws § 257.217(6) (2003). Through this procedure, a purchaser of a vehicle acquires a "temporary registration" when it transfers a license plate from one of its vehicles to a newly acquired vehicle. Unfortunately for Budget, however, the alternative procedure does not permit a purchaser to transfer a plate from a vehicle that it does not own to another vehicle that it does. Here, Team Fleet owned the Ford to which license plate NVQ532 was registered, but Budget Systems attached the plate to its own Xterra. Because Budget Systems and Team Fleet are distinct

---

**15.** In 2003, the Michigan legislature amended the statute so that permitting a vehicle to be operated without a valid plate is now a "civil infraction"—not a misdemeanor—*see* 2003 Mich. Pub. Acts 9, but this amendment does not affect our disposition of the case because the change occurred well after the February 16, 2002 accident.

corporate entities, affixing license plate NVQ532 to the Xterra did not effect a temporary registration.[16] Budget Systems observed neither the regular nor the alternative registration procedures, and thus we find that, at the time that Budget permitted Powell to drive it, the Xterra did not bear a "valid registration plate issued for the vehicle."

Still, Budget System's conduct would have amounted to a misdemeanor only if it "knowingly" permitted Powell to drive the Xterra while license plate NVQ532 was attached to it. This issue need not detain us long because Budget Systems prepared the Rental Agreement that specifically identifies the Xterra's license plate as Michigan license plate NVQ532. See Simon Decl. Ex. C. In view of this evidence, we hold that no reasonable jury could conclude that Budget did not "knowingly" permit Powell to drive the Xterra with an invalid license plate.

By leasing him the Xterra, Budget Systems knowingly permitted Powell to operate it without a valid registration plate, and Michigan law made such conduct a misdemeanor at the time it occurred. See Mich. Comp. Laws § 257.255(2) (2001). In similar situations, the Michigan Supreme Court consistently has held that "all contracts which are founded on an act prohibited by a statute under a penalty are void, although not expressly declared to be so." Shattuck v. Watson, 164 Mich. 167, 129 N.W. 196, 199 (1910); see also Bayer v. Jackson City Bank & Trust Co., 335 Mich. 99, 55 N.W.2d 746, 749 (1952) ("[F]ailure to comply in any transaction with statutory requirements, when noncompliance is de-clared unlawful and subject to penalty, renders the transaction void.").

Here, the lease between Budget Systems and Powell was "founded on" a misdemeanor—Budget Systems's grant of permission to operate the Xterra without a valid license plate—so the lease is void. Since Michigan law treats the lease as a nullity, Budget Systems was not a "lessor of a motor vehicle under a lease," and Subsection 3's cap on car rental companies' vicarious liability does not apply to the facts of this case.

We conclude, therefore, that Michigan law imposes unlimited vicarious liability on Budget for Powell's negligence. See Mich. Comp. Laws § 257.401(1) (2003).[17]

## C. The Chosen Law

Having explained the relevant principles of New York and Michigan law, we must examine these states' interests so that we may classify this case as a true conflict, a false conflict, or an unprovided-for case.

 New York's law expresses an interest in its residents receiving compensation for injuries they sustain from automobile accidents. See N.Y. Veh. & Traf. Law § 388(1) (Consol.2003). In this case, however, applying New York law would not advance that interest because New York statutory law does not protect New York residents who suffer injuries in out-of-state accidents like the one here and New York common law does not permit New York residents to recover from a vehicle's owner. Thus, New York has no interest in the application of its own law.

---

16. It surely does no injustice to Budget Group to respect corporate formalities of its own making.

17. We reach this result mindful of the delicious irony in how the parties briefed this case. Budget strenuously called for the appli-cation of Michigan law, but that law saddles it with unlimited liability for Powell's negligence. On the other hand, Chappell insisted that New York law should control, but New York's common law would allow Budget to escape all liability.

■ Michigan, too, has an interest in ensuring that its residents receive compensation for the torts that they suffer, but applying Michigan law would neither advance nor inhibit that interest because the tort victim, Chappell, is not a resident of Michigan. Subsection 3 demonstrates that Michigan also has an interest in protecting car rental companies that comply with the law from unlimited vicarious liability. Such an interest, however, is not implicated here because Budget Systems violated Michigan's motor vehicle code, so Michigan would not protect it. In short, Michigan—like New York—has no interest in the application of its own law.

■ When neither jurisdiction has an interest in the application of its law, Pennsylvania courts classify the lawsuit as an unprovided-for case and apply the *lex loci delicti,* the law of the place where the injury occurred. *See, e.g., Miller v. Gay,* 323 Pa.Super. 466, 470 A.2d 1353, 1355–56 (1983); *Melville v. American Home Assurance Co.,* 443 F.Supp. 1064, 1103–04 (E.D.Pa.1977) (Becker, J.), *rev'd on other grounds,* 584 F.2d 1306 (3d Cir.1978). Here, the accident occurred in Pennsylvania, so we hold that Pennsylvania law determines the extent of Budget's vicarious liability. Pennsylvania has never modified the common law rule that, absent an employer-employee relationship, an automobile's owner is not vicariously liable for the negligence of the driver. *See Solomon v. Commonwealth Trust Co.,* 256 Pa. 55, 100 A. 534 (1917). Thus, Budget is not vicariously liable to Chappell for Powell's negligence.

*Conclusion*

Following Pennsylvania's choice-of-law methodology, we have concluded that Pennsylvania law controls the resolution of the issues in this case. Because Chap-

pell's motion for summary judgment requests that we apply New York law, we shall deny her motion. Budget's complaint seeks a declaratory judgment about which jurisdiction's law controls its liability to Chappell. We shall grant summary judgment to Budget on the claims in its complaint and declare that, under Pennsylvania law, Chappell may not recover from Budget for Powell's negligence.

Although these rulings dispose of Budget's claims, we must also address Chappell's counterclaims against Budget and her cross-claim against Powell. We shall dismiss Chappell's Section 388 counterclaim because it fails to state a claim upon which relief may be granted under Pennsylvania law, *see* Fed.R.Civ.P. 12(b)(6), but her counterclaim for Budget's negligent entrustment of the Xterra to Powell may proceed. As for the cross-claim, we note that Chappell's attorney is also Powell's attorney-of-record. The identity of counsel suggests that Chappell never served the cross-claim on Powell,[18] so we shall dismiss the cross-claim for failure to serve unless Chappell or her counsel promptly files an affidavit stating that she or he has served copies of the cross-claim and this Memorandum and Order.

*ORDER*

AND NOW, this 2nd day of February, 2004, upon consideration of plaintiff's motion for summary judgment (docket entry # 23), defendant Nicole Chappell's opposition thereto, Chappell's motion for summary judgment (docket entry # 24), plaintiff's reply, Chappell's motion for leave to file a reply (docket entry # 28), plaintiff's motion for leave to file a reply (docket entry # 30), and Chappell's motion for leave to file a surreply (docket entry # 31), and in accordance with the accompanying

---

**18.** We assume that Chappell never served the cross-claim because the attorney would have become involved in a conflict of interest if Powell were a party to the cross-claim.

Memorandum, it is hereby ORDERED that:

1. Chappell's motion for leave to file a reply is GRANTED;

2. The Clerk shall DOCKET Chappell's reply, which is attached hereto, as docket entry # 32;

3. Plaintiff's motion for leave to file a reply is GRANTED;

4. The Clerk shall DOCKET plaintiff's reply, which is attached hereto, as docket entry # 33;

5. Chappell's motion for leave to file a surreply is GRANTED;

6. The Clerk shall DOCKET Chappell's surreply, which is attached hereto, as docket entry # 34;

7. Chappell's motion for summary judgment is DENIED;

8. Plaintiff's motion for summary judgment is GRANTED IN PART; and

9. It is hereby DECLARED that Pennsylvania law governs Budget Rent–A–Car System, Inc.'s vicarious liability for Joseph Powell, III's negligence;

10. It is hereby DECLARED that, pursuant to the law of Pennsylvania, Budget Rent–A–Car System, Inc. is not liability to Nicole Chappell for Joseph Powell, III's negligence;

11. Chappell's first counterclaim is DISMISSED;

12. By February 6, 2004, Chappell or her counsel shall FILE an affidavit stating that she or he has served copies of the cross-claim and this Memorandum and Order upon Joseph Powell, III, or we shall dismiss the cross-claim; and

13. Joseph Powell, III shall FILE a response to the cross-claim by February 23, 2004.